OA 91  Criminal Complaint

# United States District Court

**NORTHERN** DISTRICT OF **CAILFORNIA**

UNITED STATES OF AMERICA
v.
JEFFREY BENJAMIN HARRISON

(Name and Address of Defendant)

**FILED** CRIMINAL COMPLAINT

JUL 0 3 2007   Case Number: **3-07-70396 JL**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about **July 1, 2007** (Date) in **San Francisco** County, in the **Northern** District of **California** defendant(s) did,

(Track Statutory Language of Offense)
See attachment, attached and incorporated herein by reference

in violation of Title **18** United States Code, Section(s) **2252(a)(4)(B) and (a)(1)**

I further state that I am a(n) **Special Agent, U.S. ICE** and that this complaint is based on the following facts:
Official Title

See the Affidavit of Michael Appio, attached and incorporated herein by reference

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Approved As To Form: _Susan Badjn_
AUSA

_[signature]_
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

**7-3-07**
Date

at San Francisco, California
   City and State

JAMES LARSON, Chief U.S. Mag. Judge
Name & Title of Judicial Officer

_[signature]_
Signature of Judicial Officer

JEFFREY BENJAMIN HARRISON COMPLAINT, CONTINUED

**Count One**: On or about July 1, 2007 in San Francisco County, Northern District of California, JEFFREY BENJAMIN HARRISON knowingly possessed one or more books, magazines, periodicals, films, video tapes, and other matter that contained a visual depiction that had been mailed, and had been shipped and transported in interstate and foreign commerce, and which was produced using materials which had been mailed and so shipped and transported, by any means, including by computer, and the producing of such depiction involved the use of a minor engaging in sexually explicit conduct and such depiction was of such conduct, in violation of Title 18, United States Code, Section 2252(a)(4)(B).

**Count Two**: On or about July 1, 2007 in San Francisco County, Northern District of California, JEFFREY BENJAMIN HARRISON knowingly transported and shipped in interstate and foreign commerce by any means, including by computer and mails, a visual depiction and the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such depiction was of such conduct, in violation of Title 18, United States Code, Section 2252(a)(1).

## MAXIMUM PENALTIES

**Count One:** ten years imprisonment; $250,000 fine; three-year term of supervised release; $100 special assessment

**Count Two:** not less than five years and not more than twenty years imprisonment; $250,000 fine; three-year term of supervised release; $100 special assessment.

| | |
|---|---|
| **UNITED STATES DISTRICT COURT** } | |
| } | ss.  **AFFIDAVIT** |
| **NORTHERN DISTRICT OF CALIFORNIA** } | |

I, Michael J. Appio, Special Agent, U.S. Immigration and Customs Enforcement (ICE), first being duly sworn, do depose and state:

## I.   PURPOSE OF AFFIDAVIT

1. I am a Special Agent with United States Immigration and Customs Enforcement (ICE). Among my duties are investigation of potential violations of 18 U.S.C. § 2252(a)(4)(B) – Possession of Child Pornography and 18 U.S.C. § 2252(a)(1) – Transportation of Child Pornography.

2. This affidavit is made in support of an application for a warrant to search the residence of Jeffrey Benjamin HARRISON for evidence, fruits and instrumentalities of violations of 18 U.S.C. § 2252(a)(4)(B) and 18 U.S.C. § 2252(a)(1). As described below, HARRISON was detained on July 1, 2007, at San Francisco International Airport after being found in possession of digital image files of child pornography saved on his laptop computer. After waiving his Miranda rights, HARRISON told me that he downloaded from the internet and saved onto his laptop computer images of child pornography. As further described below, there is probable cause to believe that concealed within the residence of HARRISON, located at 81 Corte Lenosa, Apartment A, Greenbrae, California 94904, there exist evidence, fruits, and instrumentalities of violations 18 U.S.C. § 2252(a)(4)(B) – Possession of Child Pornography and 18 U.S.C. § 2252(a)(1) – Transportation of Child Pornography.

3. This affidavit is also made in support of criminal complaint for violations of 18 U.S.C. § 2252(a)(4)(B) – Possession of Child Pornography, and 18 U.S.C. § 2252(a)(1) – Transportation of Child Pornography, against Jeffrey Benjamin HARRISON.

1

4. The purpose of this affidavit is to set forth facts establishing probable cause to support the issuance of the requested search and arrest warrants. The information contained in this affidavit is based either on my own personal knowledge or on information provided to me by other law enforcement officers. Not all facts known to me are necessarily contained in this affidavit. The affidavit is limited to the facts relevant and necessary to establish probable cause for the requested search and arrest warrants.

## II.     EXPERIENCE AND TRAINING

5. I am a Special Agent with United States Immigration and Customs Enforcement (ICE), assigned to the office of the Resident Agent in Charge, San Francisco International Airport, and have been employed by ICE since July of 2003. Prior to my employment with ICE, I was employed as a United States Customs Inspector at San Francisco International Airport for three years. I hold a bachelor's degree from the College of Charleston, South Carolina, and completed Basic Police Training, ICE Special Agent Training, and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia.

6. In my capacity as a Special Agent with ICE, I am responsible for enforcing federal criminal statutes concerning the sexual exploitation of children. I have received training and actual experience relating to federal criminal procedure, federal statutes, and immigration and customs regulations. I have received specific training in investigative techniques concerning violations of 18 U.S.C. § 2252(a)(4)(B) and 18 U.S.C. § 2252(a)(1), which prohibit possession and transportation of child pornography. As a Special Agent with ICE, I have conducted and assisted with numerous child pornography investigations and seized computers and other items containing child pornography. I have reviewed images containing child

pornography in a variety of formats (such as digital still images and video images) and media (such as floppy diskettes, videotapes, magazines, and printed images).

7. As a Special Agent with ICE, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States.

### III. APPLICABLE LAW

8. Under 18 U.S.C. § 2252(a)(4)(B), it is illegal to possess child pornography. By the term child pornography I mean a visual description of a person under the age of eighteen (18) years old engaging in sexually explicit conduct. Specifically, 18 U.S.C. § 2252(a)(4)(B) subjects to criminal penalties any person who knowingly possesses one (1) or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the producing of such visual description involves the use of a minor engaging in sexually explicit conduct and such visual description is of such conduct.

9. Under 18 U.S.C. § 2252(a)(1), it is illegal to transport child pornography. Specifically, 18 U.S.C. § 2252(a)(1) subjects to criminal penalties any person who knowingly transports or ships in interstate or foreign commerce by any means including by computer or mails, any visual depiction, if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

## IV. RELEVANT TERMS AND DEFINITIONS

10. For purposes of this warrant, the foregoing terms are defined as follows:

a. <u>Hardware</u>. Computer hardware consists of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data processing devices (such as central processing units, self-contained laptop and notebook computers, hand-held electronic organizers, personal digital assistants, and WebTV units), internal and external storage devices (magnetic storage devices such as hard disk drives, diskette drives, and tape drives, optical storage devices such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices), and related communication devices such as modems, cables, connectors, programmable telephone dialing or signaling devices, and electronic tone-generating devices, and any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys and locations.

> 1. The term "computer" is defined under 18 U.S.C.§ 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such device."

b. <u>System Peripherals</u>: A piece of equipment that sends data to, or receives data from, a computer. Keyboards, mouses, printers, scanners, plotters, video display monitors, and certain types of facsimile machines are examples of peripherals.

c. <u>Software</u>: Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, graphics, or

4

spreadsheet programs), utilities, compilers, interpreters, and communications programs.

d. <u>Documentation</u>: Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

e. <u>Passwords and Data Security Devices</u>: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (string of alphanumeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, cards, and circuit boards. Data security software or digital code may include a programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

f. <u>Storage Media</u>: Storage media includes any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information. Examples of storage media include diskettes, CD-ROMs, DVD's, magnetic tapes, ZIP disks, JAZ disks, and EPROMS.

g. <u>Internet</u>: The Internet is defined as a non-commercial, worldwide network of computers. It is a self-governing network devoted mostly to communication and research and has millions of users worldwide. The Internet is not an online service but a collection of tens of thousands of computer networks, online services, and single user components.

h. <u>Internet Protocol (IP)</u>: The primary protocol upon which the Internet is based. It allows information to travel through multiple networks on the way to its final destination.

i. <u>IP Address</u>: A unique number assigned to every computer directly connected to the Internet (for example 190.25.240.1). The IP Address consists of four parts and is unique to each machine and can be used to identify a particular machine on the network.

j. <u>Internet Service Provider (ISP)</u>: A business that allows a user to connect to the Internet through its computers for a fee. ISPs usually provide an Internet connection, an electronic mail (e-mail) address, and sometimes Internet browsing software. A user also may connect to the Internet through a commercial online service such as CompuServe or America Online. With this service, users may also have access to other features such as chat rooms and searchable databases.

k. "<u>JPEG</u>": graphic image file.

l. "<u>MPEG</u>": A video image file. MPEG files are generally larger than JPEG files and require the user to have a computer with sufficient processor speed, internal memory, and empty hard disk space. MPEG viewer software is also needed to play the files.

m. <u>Uniform Resource Locator (URL)</u>: The address of a resource or file located on the Internet, also called a "domain name".

### IV.    BACKGROUND REGARDING COMPUTERS

11. Based on my training, experience and knowledge, and on information provided by other individuals who are familiar with computer systems and technology, I know the following:

a. The Internet is a worldwide network of computer systems operated by governmental entities, corporations, universities, and others. In order to access the Internet, the individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet.

b. A device known as a modem allows any computer to connect to another computer through the use of telephone lines. The modem may be internal or external to the computer.

c. By connection to an Internet Service Provider ("ISP") host computer, an individual with a computer can make electronic contact with millions of computers around the world.

d. A server is a computer that is attached to a dedicated network and serves many users. An e-mail server allows users to post and read messages, and to communicate via private electronic mail. An Internet Relay Chat (IRC) server allows users to engage in "chat sessions," which are real-time conversations where the participants communicate by using their keyboards, to send and receive files, and to share information.

e. To access an ISP, one must pay a monthly fee to the ISP operator.

f. Using a modem, one can transmit and receive e-mail or IRC chats over telephone lines between computers.

12. Based on training that I have received, through my personal use of computers, and information obtained from individuals who have knowledge of computer systems and technology, I have knowledge of the method by which e-mails are transmitted over telephone lines between computers, and I know the following:

    a. With a modem, a computer user can transport a computer file to his own computer, so that the computer file is stored in his computer. The process of transporting a file to one's own computer is called downloading.

    b. The user can then view the file on his/her computer screen (monitor), and can save or retain the file on his/her computer for an indefinite time period.

    c. In addition to permanently storing the file on the computer, the user may print the file.

    d. The original file that was downloaded is also maintained in the originating computer.

    e. With a modem, a computer user can send a file from the computer to another individual on the Internet. This process of sending a file is called uploading.

    f. The process of uploading is similar to the downloading process except the user is sending the computer file to others instead of retrieving the information from another computer.

## V.    OFFENDER TYPOLOGY

13. Based on my experience and on discussions with other law enforcement officers, I have learned that there are many types of preferential sex offenders. Some of these offenders have a primary sexual interest in children and are often referred to as pedophiles. This affidavit deals with these types of offenders. Preferential sex offenders receive sexual gratification from actual contact with children and/or from fantasy involving children, through the use of photographs and/or digital images that can be stored on computer hard disks and computer floppy disks and on video compact disks (CDs). These digital images can be attached to e-mail messages, transferred over the internet, and stored in an individual's e-mail account. I am aware that sex offenders often collect sexually explicit material consisting of

photographs, video tapes, books, slides, and digital images which they use for their own sexual gratification and fantasy and to show children in an attempt to lower the child's inhibitions.

14. I have learned that the Internet has provided preferential sex offenders with a virtually anonymous venue in which they can meet other people with the same or similar sexual interests. Preferential sex offenders also use the computer to electronically exchange pictures of children or of adults engaged in sexual activity with children. These images are readily and easily available on the Internet. These images can then be downloaded and stored on the computer, CD's, or floppy disks, and then viewed on the computer monitor at any time. These images can also be attached to e-mail messages and stored in an individual's e-mail account. Preferential sex offenders will also participate in chat rooms in order to communicate with other like-minded individuals. This communication serves to legitimize their conduct and beliefs.

15. These persons collect sexually explicit material consisting of pictures, films, videotapes, magazines, negatives, photographs, correspondence, mailing lists, books and slides, which they use for their own sexual gratification and fantasy. The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collector's most cherished sexual fantasies involving children. Such persons rarely, if ever, dispose of their sexually explicit materials, especially when they have taken the photographs or made the videotapes involved, as these materials are treated as prized possessions.

16. Based on my training and experience, it is known that preferential sex offenders, which are individuals that have definite sexual inclinations for children, and collectors of sexually explicit images of minors often times seek to correspond with one another, and meet with one another to share information and material in an effort to increase the size of or enhance their collections. It is not until these collections are uncovered by law enforcement or others that the preferential sex offenders destroy or seek alternatives and secure hiding places to store their collection.

17. These persons use sexually explicit materials, including those listed above for lowering the inhibitions of children, sexually stimulating children and themselves, and for demonstrating activity with children. These persons often correspond or meet with one another to share information and identities of their victims as a means of gaining status, trust, acceptance and psychological support.

18. These persons often collect, read, copy or maintain names, addresses, phone numbers or lists of persons who have similar sexual interests. They may have been collected by personal contact or through advertisements in various publications. These contacts are maintained as a means of personal referral, exchange and commercial profit. These names may be maintained electronically, in the original publication, in phone or notebooks, or merely on scraps of paper.

19. Maintenance of diaries relating to sexual encounters by these persons with children is not uncommon. These accounts of their sexual experiences are used as a means of reliving the encounter. Such diaries might consist of notebooks, scraps of paper, formal diaries or computer entries in a home computer.

20. These persons will maintain names, addresses, phone numbers, of victims, victim's friends, or victims of other child molesters, athletic rosters and school rosters in the same manner as described above. These persons often collect and maintain photographs of children they are or with whom they have been involved. These photos may depict children fully clothed, in various stages of undressing, totally nude, or involved in various activities not necessarily sexually explicit in nature.

21. These persons almost always maintain and possess their material in the privacy and security of their homes or some other secure location where it is readily available. The collector is aroused while viewing the collection and, acting on that arousal, he often masturbates thereby fueling and reinforcing his attraction to children. This is most easily accomplished in the privacy of his own home. Because the collection reveals the otherwise private sexual desires and intent of the collector and represents his most cherished sexual

fantasies, the collector rarely, if ever, disposes of the collection. The collection may be culled and refined over time, but the size of the collection tends to increase. Individuals who utilize a collection in the seduction of children or to document that seduction treat the materials as prized possessions and are especially unlikely to part with them.

## VI.   FACTS ESTABLISHING PROBABLE CAUSE

22. On July 1, 2007, Jeffrey Benjamin HARRISON, date of birth November 7, 1944, arrived at San Francisco International Airport (SFO) from Manila, Philippines aboard Cathay Pacific airlines flight number 872. U.S. Customs and Border Protection Officer (CBPO) Matthew Moran approached HARRISON and asked for his passport and customs declaration. HARRISON asked CBPO Moran why he needed to show his passport again and appeared angry that he was selected for a basic interview. CBPO Moran examined Harrison's United States passport and noticed that HARRISON had immigration stamps showing frequent travel to the Philippines. HARRISON appeared to be traveling alone, had numerous trips to a high-risk area for child pornography and child sex tourism, and was showing signs of nervousness such as avoiding eye contact and shaking hands. Based on HARRISON's demeanor and his frequent travel to a high-risk area, CBPO Moran referred him for a baggage examination.

23. In the secondary inspection area, HARRISON told CBPO Sheryl Edwards that he owned all of the items in his possession, including the laptop computer he was carrying. HARRISON told CBPO Edwards that he was returning from a ten (10) day business trip to the Philippines. Due to the fact that HARRISON was returning from a country which is considered high risk for child sex tourism and child pornography, CBPO Edwards felt it was appropriate to review the numerous amounts of media (CDs, laptop, jump drives, digital camera) in HARRISON's possession to see if they contained child pornography. As CBPO Edwards started to leave the inspection area in order to review the CDs on a CBP computer in the main office, HARRISON started following and belligerently stated that the CDs were his personal belongings and CBP could not review them outside of his presence.

11

24. While CBPO Edwards was reviewing HARRISON's CDs, CBPO Joshua Cross asked HARRISON if he owned the laptop computer in his possession. HARRISON stated that it was his computer and that it was for business and personal use. CBPO Cross asked HARRISON if anyone else had access to the password protected computer. HARRISON said his son Ashley Harrison, Ashley's roommate Mark Thaler, and HARRISON's business partner Don Stern all had access to the laptop. After HARRISON provided password "jeffreyb" to access the computer, CBPO Cross used the computer's search function to retrieve image and video files. During the review of the image and video files, CBPO Cross viewed an image file title "03509_1fs-024-071_122_71410.jpg". CBPO Cross described this image as a naked female approximately ten (10) to thirteen (13) years old, with her legs spread.

25. CBPO Edwards notified me of the circumstances surrounding HARRISON's inspection, and I arrived at SFO in order to view the images and interview HARRISON. I examined HARRISON's laptop computer and noticed hundreds of images of child pornography, including images of prepubescent females posed in sexually explicit poses, images of naked minor females in bondage, and images of naked minor females engaged in sex acts with adult males and/or other minors. Many of the females in these images appeared to me to be between the ages of five (5) and twelve (12) years old. All of the images of child pornography that I viewed on HARRISON's computer had the file path C:\Documents and Settings\jeff\My Documents\download. This file path indicates the images were saved to the "C" hard drive (typically the "C" drive is a computer's default storage location), in a folder named "download." All of the child pornography images in the "download" folder were active images; they were not images that had been deleted and then recovered with forensic software. Examples of the images include:

- "1173822342896.jpg" depicts a naked Asian female who appears to be approximately eight (8) to eleven (11) years old sitting in the lap

12

of a naked adult Caucasian male. The girl has her legs spread and the adult male is spreading her vagina open with his hands.

- "1174448452308.jpg" depicts a naked Caucasian female who appears to be approximately five (5) to nine (9) years old. She has her legs spread and is holding her vagina open with her index fingers. "Look....my pussy is a little bigger now...not much though. Hey, I'm only 7." is written in the upper right corner of the image.

- "1174629909142.jpg" depicts a naked Asian female who appears to be approximately seven (7) to ten (10) years old. She is lying on her back with her legs spread and has a sex toy inserted into her vagina.

26. At approximately 1631 hours, I identified myself as an ICE Special Agent and read HARRISON his Miranda rights in the presence of CBPO Moran. HARRISON verbally waived his rights and agreed to speak with me. I showed HARRISON copies of the three (3) images described in paragraph twenty-five (25) and he admitted downloading all three (3) images to his laptop. HARRISON said he used pornography for "masturbatory fantasy". I asked HARRISON how he would describe the three (3) images he admitted downloading. HARRISON initially described them as pornography. I then asked HARRISON if they represented a specific type of pornography to which he replied, "child pornography." HARRISON then said, "I downloaded it. I know it's not proper."

27. HARRISON said he first viewed child pornography around July or August 2006 while in the Philippines. HARRISON said he downloaded most of the child pornography images on his laptop while on trips to the Philippines. HARRISON said he downloaded some of the child pornography images on his laptop from his home at 81 Corte Lenosa, Apartment A, Greenbrae, California. HARRISON stated that there were other computers at his home. HARRISON said there was no child pornography at his home. I asked HARRISON if he would provide written consent for agents to search his home, but he refused.

28. I questioned HARRISON about the access other people had to his computer. HARRISON said that his son Miguel and a friend had downloaded adult pornography to the

13

laptop in the past. I then asked HARRISON if it was likely that Miguel was responsible for downloading any child pornography. HARRISON said that he (HARRISON) was responsible for downloading "90 percent" of all the images on the laptop, and claimed responsibility for downloading all of the child pornography. HARRISON said the download dates on most of the child pornography should correspond to his overseas trips.

29. I asked HARRISON if he ever refined his collection of child pornography by deleting images he no longer liked. HARRISON said that he did not delete child pornography after he downloaded it. I asked HARRISON if all of the child pornography on his laptop represented the sum total of all the child pornography that he had ever downloaded, and he replied in the affirmative.

30. HARRISON said he used to work as a lawyer in the Los Angeles area and dealt with civil issues involving technology companies. HARRISON said he is currently the CEO of a Singapore based technology company involved in developing new text messaging applications. HARRISON said his position as CEO accounts for his frequent trips to Asia.

31. HARRISON said he accesses the internet using his laptop. He said he has internet access from home through AT&T high speed DSL.

32. HARRISON said his current address is 81 Corte Lenosa, Apartment A, Greenbrae, California 94904. This address is listed on HARRISON's customs declaration and the California State Bar website. This address is also listed on HARRISON's California driver license record.

## IX.  CONCLUSION

33. Based on the above facts and information, I submit there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252(a)(4)(B) and 18 U.S.C. § 2252(a)(1), will be found at 81 Corte Lenosa, Apartment A, Greenbrae,

California 94904. As stated above, HARRISON was detained on July 1, 2007, at San Francisco International Airport after being found in possession of digital image files of child pornography saved on his laptop computer. After waiving his <u>Miranda</u> rights, HARRISON told me that he downloaded from the internet and saved onto his laptop computer images of child pornography. HARRISON admitted that he downloaded some of these child pornography images from the internet while he was at his home at 81 Corte Lenosa, Apartment A, Greenbrae, California 94904. I respectfully request that a search warrant be issued authorizing the United States Department of Homeland Security, Immigration and Customs Enforcement, with appropriate assistance from other law enforcement officers, to enter the premises described in Attachment "A" and therein search for and seize the items set forth in Attachment "B", which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252(a)(4)(B) and 18 U.S.C. § 2252(a)(1) and are thus subject to search and seizure pursuant to Rule 41(c) of the Federal Rules of Criminal Procedure. I further request that a no bail arrest warrant be issued for Jeffrey Benjamin HARRISON.

In order to protect the integrity of the investigation, I additionally request that the criminal complaint naming Jeffrey Benjamin HARRISON; the search warrant for the premises at 81 Corte Lenosa, Apartment A, Greenbrae, California; and the affidavit in support of the search warrant for the premises at 81 Corte Lenosa, Apartment A, Greenbrae,

California, as well as the Court's Sealing Order be filed by the Clerk of the Court under seal and be maintained under seal until further order of the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Michael J. Appio, Special Agent
U.S. Immigration and Customs Enforcement

Sworn to before me, and subscribed in my presence,
This **3d** day of July, 2007.

THE HONORABLE JAMES LARSON
Chief United States Magistrate Judge

13