JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney

BRIAN STRETCH (CSBN 163973)
Chief, Criminal Division

DENISE MARIE BARTON (MABN 634052)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-7359
Facsimile: (415) 436-7234
denise.barton@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. 07-0594 PJH |
| Plaintiff, | ) |
| v. | ) MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE AND REQUEST FOR AN EVIDENTIARY HEARING[1] |
| JEFFREY HARRISON, | ) |
| Defendant. | ) Hearing Date: April 9, 2008, 2:30 pm<br>) Courtroom:     17-3 |

---

[1] Per Order of the Court dated February 15, 2008 (ECF Document No. 54), this Memorandum is due March 7, 2008. The ECF system ordinarily permits filing up to 11:59 pm on the day of filing. The ECF system went off-line at 6:00 pm on March 7, 2007 for maintenance and the United States was unable to electronically file and serve this Memorandum on March 7, 2008 via the ECF system. However, to ensure that defense counsel was served with the United States Memorandum in compliance with the Court's Order, counsel for the United States served defense counsel by email on March 7, 2008, as the ECF system would have done if it had been operational.

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH

1    The defendant now seeks to suppress child pornography images found on his laptop

2    computer and other electronic storage devices.  The child pornography was discovered in the

3    course of a lawful border search of the defendant's belongings when he entered the United States

4    at San Francisco International Airport from the Philippines.  First, in patent disregard of the

5    well-established border search exception to the Fourth Amendment, the defendant incorrectly

6    claims that computers are not subject to suspicionless border searches.  In support of this issue,

7    the defendant relies on a faulty argument that was has only been articulated in one case - <u>United

8    States v. Arnold</u>, 454 F. Supp. 2d 999 (C.D. Cal. 2006).  As set forth below, the <u>Arnold</u> decision,

9    currently on appeal in the Ninth Circuit, is a poorly decided case that completely disregards

10   well-established Supreme Court and Ninth Circuit law and cannot be the basis to overturn

11   centuries of long-standing law authorizing the suspicionless search of a persons's belongings

12   upon entry into the United States.  Next, the defendant asserts, without any legal or logical

13   support, that an attorney's computer should not be subject to a suspicionless border search.  The

14   defendant claims that attorney computers should not be searched absent a quantum of

15   "reasonable suspicion."  Defendant takes this unique position notwithstanding the fact that not a

16   single court has stated that attorneys, or their computers, are subject to greater Fourth

17   Amendment protections than other persons.  In fact, courts across the country have recognized

18   that attorneys - inside the country and at the border - are subject to search on the same terms and

19   conditions any other person.

20                                    **FACTUAL BACKGROUND**

21       On July 1, 2007, the defendant arrived at San Francisco International Airport (SFO).

22   *Harrison Declaration*, ¶ 2; *Exhibit D to Defendant's Motion (ECF Document No. 50)*, JH064

23   (Customs and Border Protection Officer Reports).  After claiming his luggage, the defendant was

24   referred for secondary inspection.  *Harrison Decl.*, ¶ 7.  During secondary inspection, Customs

25   and Border Protection officers inspect the belongings of international passengers for contraband.

26   *Declaration of Sheryl Edwards,*  ¶ 2 (attached as <u>Exhibit A </u>).  At the secondary inspection point,

27   the defendant encountered Customs and Border Protection (CBP) Officer Sheryl Edwards.

28   *Edwards Decl.*, ¶  3 .  Officer Edwards observed that the defendant was upset that he had been

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH

1    referred to secondary inspection. *Edwards Decl.*, ¶ 3.  In speaking with the defendant, Officer

2    Edwards learned that the defendant had returned from a 10 day business trip from the Philippines

3    and that he was the owner of a company called Global Mobile Technologies. *Edwards Decl.*, ¶

4    4.  Officer Edwards noted that the defendant had a large amount of luggage for a 10 day business

5    trip. *Edwards Decl.*, ¶ 4.  Officer Edwards does not recall the defendant telling her that he was

6    an attorney or describing his legal work. *Edwards Decl.*, ¶ 5.

7        While at the secondary inspection area, Officer Edwards began to search the defendant's

8    belongings and found a number of CD-Rs in plastic sleeves.  On one of the CD-Rs, she saw what

9    she believed to be a questionable photocopy of the Microsoft logo, causing her to question if the

10   CD-R contained contraband pirated software. *Edwards Decl.*, ¶ 7.  When discussing the CD-Rs

11   with the defendant, the defendant told Officer Edwards that the CD-Rs were business-related.

12   He did not tell her that the CD-Rs contained any legal files or privileged materials. *Edwards*

13   *Decl.*, ¶ 7.

14       Officer Edwards requested assistance from another CBP Officer, Officer Joshua Cross, to

15   search the defendant's belongings. *Edwards Decl.*, ¶ 8; *Declaration of Joshua Cross,* ¶ 2

16   (attached as <u>Exhibit B</u>).  Officer Edwards knew that the defendant was returning from a country

17   known for child sex tourism and child pornography, which can easily be transported on

18   electronic media, and had observed a suspect Microsoft logo with a CD-R which could have

19   contained pirated software. *Edwards Decl., ¶ 8*.  When Officer Edwards began to leave the

20   secondary inspection area with the defendant's CD-Rs to review the CD-Rs, the defendant

21   became agitated that she was leaving with the CD-Rs, tried to follow her, and had to be told to

22   stay where he was by another CBP Officer. *Edwards Decl., ¶ 9*.  The defendant's reaction to

23   Officer Edwards leaving with the CD-Rs gave her further suspicion. *Edwards Decl., ¶ 9*.

24       Officer Edwards took the CD-Rs to the CBP Office to view the CD-Rs on the CBP

25   computer. *Edwards Decl.*, ¶ 9.  When reviewing the CD-Rs, Officer Edwards opened the CD-Rs

26   in thumbnail format – a small view of all files – so that she could quickly view the files and

27   search for contraband. *Edwards Decl.*, ¶ 11.  Officer Edward's practice is to view the files in

28   thumbnail view and open them if the image appears to be contraband. *Edwards Decl.*, ¶11.

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH

When reviewing the defendant's CD-Rs, Officer Edwards discovered child pornography images. *Edwards Decl.*, ¶ 11.

Officer Cross, not Officer Edwards, searched the defendant's laptop computer. *Edwards Decl.*, ¶ 10; *Cross Decl.*, ¶ 3. Officer Edwards was not even present when Officer Cross was searching the computer. *Edwards Decl.*, ¶ 10; *Cross Decl.*, ¶ 3. Before he began searching the defendant's computer, Officer Cross asked the defendant who had access to the computer; the defendant responded that he, his business partner, his son, and his son's roommate all had access to the computer. *Cross Decl.*, ¶ 10. When searching computers, Officer Cross asks a traveler to enter the computer password. Consistent with this practice, he asked the defendant to enter his computer password and the defendant did, without issue. *Cross Decl.*, ¶ 4. Officer Cross has no memory of the defendant ever telling him that the computer contained attorney-client privileged materials. *Cross Decl.*, ¶4. If the defendant had made that statement, Officer Cross would have contacted a supervisor. *Cross Decl.*, ¶ 3.

When searching the computer, Officer Cross reviewed the computer for image files, specifically picture and video files. *Cross Decl.*, ¶ 5. During his search, Officer Cross discovered an image that he believed to be child pornography. *Cross Decl.*, ¶ 5.

## **ARGUMENT**

I. COMPUTERS AND OTHER ELECTRONIC STORAGE DEVICES ARE SUBJECT TO SEARCH AT THE BORDER AND DO NOT REQUIRE REASONABLE SUSPICION AS A PREDICATE TO SEARCH.

Defendant is flatly wrong in his argument that computers cannot be searched at the border absent reasonable suspicion. Although such all searches must be "reasonable" in accordance with the Fourth Amendment, a "reasonable" search does not require "reasonable suspicion." The reasonableness of a search is assessed in terms of the nature of the search. The Supreme Court and Ninth Circuit have repeatedly held that border searches of property, done without any quantum of suspicion, are reasonable under the Fourth Amendment and thereby permissible.

//

//

1
2

**A. Customs Officials Have Longstanding Plenary Authority under the Fourth Amendment to Conduct Suspicionless Searches of Personal Property at the International Border**.

3    "Time and again," the Supreme Court has "stated that 'searches made at the border,

4    pursuant to the longstanding right of the sovereign to protect itself by stopping and examining

5    persons and property crossing into this country, are reasonable simply by virtue of the fact that

6    they occur at the border.'"  United States v. Flores-Montano, 541 U.S. 149, 152-53 (2004)

7    (quoting United States v. Ramsey, 431 U.S. 606, 616 (1977)).  The suspicionless border search

8    rule has a history as old as the Fourth Amendment itself and is justified by the nation's

9    longstanding right to protect itself.  Moreover, as a corollary of the government's sovereign

10    interest in protecting its borders, travelers have a substantially reduced expectation of privacy

11    when crossing the international border.  Hence, as the Ninth Circuit explained four decades ago,

12    "it is too well established to require citation of authority that [border] searches are unique, that

13    the mere fact that a person is crossing the border is sufficient cause for a search[,]" that "every

14    person crossing our border may be required to disclose the contents of his baggage," and that

15    "[e]ven 'mere suspicion' is not required."  Henderson v. United States, 390 F.2d 805, 808 (9th

16    Cir. 1967).

17    The defendant now asks this Court to disregard well-settled principles and ignore

18    controlling precedent upholding suspicionless property searches at the border, relying solely on

19    the case of United States v. Arnold, a poorly decided district court case from the Central District

20    of California that is currently on appeal.  The Arnold case is not, as the defendant states,

21    "controlling law in the Ninth Circuit."  See Defendant's Memorandum of Points and Authorities

22    in Support of Motion to Suppress, p. 7.

23

24    1.    Suspicionless Border Searches of Property Are Deeply Embedded in the Nation's
25          History and Justified by the Government's Paramount Interest in Border Security.

26    The authority of customs officers to conduct warrantless, suspicionless searches at the

27    border predates the adoption of the Fourth Amendment and has long been recognized as a

28

1    concomitant aspect of the sovereign's interest in controlling its borders..[2]   See United States v.

2    Villamonte-Marquez, 462 U.S. 579, 585 (1983) (stating government's authority to conduct

3    warrantless border searches has an "impressive historical pedigree"); Witt v. United States, 287

4    F.2d 389, 391 (9th Cir. 1961) ("[D]ifferent rules are applicable, and for over a hundred years

5    have been applicable with respect to the plenary power to search at the border and the more

6    circumscribed power existing anywhere else within the country's boundaries.").  Today, this

7    plenary search authority can be found in the modern statutes, including Title 19, United States

8    Code, sections 1496 and 1582, that, like their historical antecedent, authorize customs officers to

9    search -- without individualized suspicion -- the contents of people's luggage.[3]  The

10   suspicionless border searches authorized by these modern statutes thus have "a history as old as

11   the Fourth Amendment itself," Ramsey, 431 U.S. at 619, and are accordingly compatible with

12   the Fourth Amendment.

13       The greater authority to search persons and property crossing the United States border

14   stems directly from the government's paramount interest in protecting the security and integrity

15   of its borders.  See Flores-Montano, 541 U.S. at 153 ("It is axiomatic that the United States, as

---

17   [2]  The nation's earliest customs statute, Act of July 31, 1789, ch. 5, 1 Stat. 29, was enacted two months
18   before Congress proposed the Bill of Rights, including the Fourth Amendment, to the states.  See Ramsey, 431 U.S.
     at 616.  The 1789 Act granted customs officials "full power and authority" to enter and search "any ship or vessel, in
19   which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed,"
     whereas in contrast, searches of any "particular dwelling-house, store, building, or other place" were authorized only
20   with a warrant upon "cause to suspect." Id. at 616 n.12 (quoting text of statute).  Because this statute, which
     recognized "plenary customs power" to conduct warrantless inspections of vessels, was passed by the same
21   Congress that promulgated the Fourth Amendment, "it is clear that the members of that body did not regard searches
     and seizures of this kind as 'unreasonable.'"  Id. at 616-17 (quoting Boyd v. United States, 116 U.S. 616, 623
22   (1886)).

23   [3]  See, e.g., 19 U.S.C. § 1496 (the "appropriate customs officer may cause an examination to be made of the
     baggage of any person arriving in the United States in order to ascertain what articles are contained therein and
24   whether subject to duty, free of duty, or prohibited notwithstanding a declaration and entry therefor has been made");
     19 U.S.C. § 1582 (the "Secretary of the Treasury may prescribe regulations for the search of persons and baggage . .
25   .; and all persons coming into the United States from foreign countries shall be liable to detention and search by
     authorized officers or agents of the Government under such regulations"); see also 19 U.S.C. § 1461 (for
26   "merchandise and baggage imported or brought in from any contiguous country," customs officers may require
     opening for inspection of "any trunk, traveling bag, sack, valise, or other container").  Among the relevant
27   regulations implementing § 1582, 19 C.F.R. § 162.6 provides, in pertinent part, that "[a]ll persons, baggage, and
     merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection
28   and search by a Customs officer."  The "Customs territory of the United States" includes the 50 states, the District of
     Columbia, and Puerto Rico.  19 C.F.R. § 101.1.

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH

sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."). The border is where the government must be the most vigilant to "interdict those who would further crime, introduce matter harmful to the United States, or even threaten the security of its citizens." United States v. Okafor, 285 F.3d 842, 845 (9th Cir. 2002). To discharge this broad and critically important mandate, customs officials have necessarily enjoyed plenary authority to search, without reasonable suspicion, all types of private belongings and effects presented for entry at the border that would otherwise ordinarily be protected against suspicionless searches if done in the interior of the country. See Carroll, 267 U.S. at 153-54; 12 200-Ft. Reels of Super 8MM. Film, 413 U.S. at 125; United States v. Thirty-Seven Photographs, 402 U.S. 363, 376 (1971).

> 2.    Travelers Crossing the Border Have a Substantially Diminished Expectation of
>        Privacy in Their Personal Belongings and Effects.

Consistent with the government's intrinsic right to examine persons and things entering the country, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." Montoya de Hernandez, 473 U.S. at 538. Travelers crossing the border do not have the same expectation of privacy that they otherwise enjoy in the interior of the country. See Flores-Montano, 541 U.S. at 154 (privacy expectation is "less at the border than it is in the interior"). As this Circuit has explained, a traveler into the United States must anticipate that he will be detained temporarily at the border," that "[h]e will be interrogated," and that "[h]is vehicle, if any, and his personal effects will be examined." " United States v. Guadalupe-Garza, 421 F.2d 876, 878 (9th Cir. 1970).

The defendant, as did the court in Arnold, completely disregards the substantially diminished privacy interests at stake in border searches. The "protection afforded by the [Fourth] Amendment varies in different settings." United States v. Ross, 456 U.S. 798, 823 (1982). "Among the circumstances to be considered is the place of the search," for a person's reasonable expectation of privacy "differs" significantly if the place of search is "the home, the street, the telephone booth, or the border." Guadalupe-Garza, 421 F.2d at 878. Thus, even

though the contents of a person's luggage may be otherwise private, "[t]he luggage carried by a traveler entering the country may be searched at random by a customs officer[.]" <u>Ross</u>, 456 U.S. at 823.  And "the luggage may be searched no matter how great the traveler's desire to conceal the contents may be." <u>Id.</u>  "[D]ifferent considerations and different rules of constitutional law" apply at the border, <u>12 200-Ft. Reels of Super 8MM. Film</u>, 413 U.S. at 125, because "a port of entry is not a traveler's home." <u>Thirty-Seven Photographs</u>, 402 U.S. at 376.

       3.    <u>Searches of Closed Containers and Items of Personal Property Contained Therein May Be Conducted Without Particularized Suspicion.</u>

By virtue of their longstanding border search authority, customs officers may search, without any individualized suspicion, the contents of a traveler's briefcase and luggage, <u>United States v. Tsai</u>, 282 F.3d 690, 696 (9th Cir. 2002), his "purse, wallet, or pockets," <u>Henderson</u>, 390 F.2d at 808, and the papers stored in such closed containers.  <u>See United States v. Schoor</u>, 597 F.2d 1303, 1305-06 (9th Cir. 1979) (airway bills carried by passengers); <u>United States v. Grayson</u>, 597 F.2d 1225, 1227 (9th Cir. 1979) (papers in shirt pocket); <u>United States v. Fortna</u>, 796 F.2d 724, 738 (5th Cir. 1986) (documents in carry-on bag, including map and handwritten note).  They may also view pictures, films, and similar graphic materials.  <u>See Thirty-Seven Photographs</u>, 402 U.S. at 365; <u>12 200-Ft. Reels of Super 8MM. Film</u>, 413 U.S. at 124 ("movie films, color slides, photographs, and other printed and graphic material"); <u>United States v. Borello</u>, 766 F.2d 46, 58-59 (2d Cir. 1985) ("the opening of the cartons and the screening of the 8-millimeter films were plainly permissible steps in a reasonable border search").

Most recently, in <u>Flores-Montano</u>, the Supreme Court reaffirmed the broad power of customs officials to search property without particularized suspicion, holding "that the Government's authority to conduct suspicionless inspections at the border includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank." 541 U.S. at 155.  While <u>Flores-Montano</u> involved the fuel container in a car, nothing in the opinion suggests, that the Court would apply a different analysis to border searches of other physical objects and containers.  Indeed, the Court's opinion itself broadly referenced border searches of "property," <u>Flores-</u>

1   Montano, 541 U.S. at 155-56, a fact that has not escaped the Ninth Circuit's attention.  See

2   United States v. Camacho, 368 F.3d 1182, 1183 (9th Cir. 2004) ("The Supreme Court [in Flores-

3   Montano] recently made clear that reasonable suspicion is usually not required for officers to

4   conduct non-destructive border searches of property.") (emphasis added).

5        The defendant takes great efforts to convince this Court that their was no "reasonable

6   suspicion" to search the defendant's computer.  Without conceding that there was not

7   "reasonable suspicion,"[4] the existence of and amount of suspicion raised by the defendant's

8   actions at SFO is irrelevant.  The defendant's computer was, like any other property, subject to

9   search with or without any quantum of suspicion.  In light of this well-established legal

10  principle, the defendant's argument fails.

11

12       4.    The Defendant Relies on a Discarded Distinction Between "Routine" and "Non-
               Routine" Border Searches of Property.

13

14       The defendant mistakenly draws from the Arnold case and articulates two different types

15  of searches - - routine and non-routine - - and asks this Court to employ that faulty standard in

16  finding that a computer search is a non-routine search that would require a level of reasonable

17  suspicion before a computer may be searched at the border.   However, the Arnold case relies

18  heavily on United States v. Molina-Tarazon, 279 F.3d 709 (9th Cir. 2002), which has since been

19  disavowed by the Supreme Court on exactly this point.  In Molina-Tarazon, a divided panel held

20  that the "border search exception" authorized only "routine searches," that "[i]n order to conduct

21  a search that goes beyond the routine, an inspector must have reasonable suspicion," and that the

22  "critical factor" in determining whether a search of "inanimate objects" is "routine" is the

23  "degree of intrusiveness."  279 F.3d at 712-13 (emphasis in original).  The Supreme Court

24  unanimously repudiated Molina-Tarazon's analysis, holding that term "routine" used in prior

25

26       [4] In fact, the Declaration of Sheryl Edwards, the CBP Officer who first encountered the defendant,
    demonstrates that ample suspicion existed that the defendant may have engaged in wrongdoing.  The defendant was
    visibly upset about having been referred for secondary inspection.  He was carrying an amount of luggage that was
27  inconsistent with the stated length of his trip.  He was returning from a country known to be a location for child sex
    tourism and source of child pornography.  He was carrying at least one CD-R that appeared to had a suspicious
    Microsoft logo and potentially pirated software.  And, when Officer Edwards attempted to view the defendant's CD-
28  Rs, the defendant became upset and attempted to stop her from viewing the CD-Rs.  Edwards Decl., ¶¶ 4, 7-8.

1    Supreme Court border search cases was merely descriptive and not intended to be the source of a

2    constitutional test for whether a heightened level of suspicion should be required in any given

3    case. Flores-Montano, 541 U.S. at 152. The Court further made clear that it was a mistake to

4    use a "balancing test" comparing the degree of intrusiveness posed by a vehicle search with that

5    caused by physical body searches. Id. As the Court concluded, "[c]omplex balancing tests to

6    determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a

7    person, have no place in border searches of vehicles." Id.

8        In the wake of Flores-Montano, the Ninth Circuit recognized that any legal distinction

9    between routine and non-routine border searches "was specifically limited to searches of the

10   person." United States v. Chaudhry, 424 F.3d 1051, 1054 (9th Cir. 2005) (emphasis added);

11   accord United States v. Flores-Montano, 424 F.3d 1044, 1049 n.6 (9th Cir. 2005) (per curiam)

12   (recognizing that distinction between "routine" and "non-routine" border searches has been

13   "severely undermined if not completely overruled in the context of property searches"). It also

14   acknowledged that Flores-Montano foreclosed the use of a balancing test to determine if a

15   property search at the border becomes so intrusive, akin to an invasive physical body search, that

16   it ceases to be "routine," thereby requiring reasonable suspicion. See United States v. Cortez-

17   Rocha, 394 F.3d 1115, 1119 (9th Cir. 2005) ("the application of the routine/non-routine

18   balancing test . . . was specifically refuted in Flores-Montano"); Flores-Montano, 424 F.3d at

19   1049 n.6 ("routine/non-routine analysis . . . has been so soundly rejected in the Constitutional

20   context").

21

22       **B.    Computer Storage Devices Are Neither Conceptually Nor Constitutionally**
23            **Different than Other Closed Storage Containers Subject to Suspicionless**
             **Border Searches.**

24       In drawing a distinction between materials in luggage versus materials in a computer, the

25   defendant, disregards contrary decisions upholding suspicionless border searches of computers;

26   assumes without foundation that electronic materials are deserving of greater Fourth Amendment

27   protection than physical items; and erects a false dichotomy between computers and other closed

28   storage containers, thereby running afoul of Supreme Court precedent foreclosing any Fourth

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH

1    Amendment distinction based on the type of container searched or the nature of its contents.

2

3            1.      Courts Have Recognized That No Suspicion Is Required to Search Computer
                     Media at the Border.
4

5            Courts have already upheld suspicionless border searches of computer storage devices.

6    In United States v. Ickes, 393 F.3d 501 (4th Cir. 2005), the Fourth Circuit upheld the border

7    search of a computer and compact discs found in the defendant's van during a customs search at

8    the United States-Canada border.  The court held that the border search of those electronic

9    media, which contained evidence of child pornography, was both within Customs' broad

10   statutory authority to search and did not run afoul of the Fourth Amendment.  Id. at 505-06.  In

11   so holding, the court rejected the defendant's invitation to engraft a reasonable suspicion

12   requirement for computer searches at the border.  Id. at 507.  As the court explained, "[t]he

13   essence of the border search doctrine is a reliance upon the trained observations and judgments

14   of customs officials, rather than upon constitutional requirements applied to the inapposite

15   context of this sort of search."  Id.  Citing Flores-Montano and Montoya de Hernandez, the court

16   stressed the government's "overriding interest in securing the safety of its citizens" and

17   contrasted that with the substantially diminished privacy interests of travelers seeking entry into

18   the country.  Id. at 506.  Similarly, in United States v. Roberts, 86 F. Supp. 2d 678 (S.D. Tex.

19   2000), the court, in discussing the constitutionality of the border search of a defendant's

20   computer and diskettes, "analogized the Fourth Amendment protection appropriately afforded an

21   individual's computer files and computer hard drive to the protection given an individual's

22   closed containers and closed personal effects."  Id. at 688-89.  With this analogy in mind, the

23   court upheld the border search of the defendant's computer and diskettes as a "paradigmatic

24   routine border search" that was no different than the "opening of luggage, itself a closed

25   container."  Id. at 689.[5]  Finally, in United States v. Irving, 2003 WL 22127913 (S.D.N.Y. 2003),

26

27          [5]    The district court also held, alternatively, that the border search was supported by reasonable suspicion.
     Id. at 688 n.4.  The Fifth Circuit affirmed the district court's decision on this alternative ground without reaching the
28   legal question of whether computers may be searched at the border without any level of suspicion.  See United States
     v. Roberts, 274 F.3d 1007, 1012 (5th Cir. 2001).

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH

11

the court likewise analogized a border search of the contents of a disposable camera and 3.5 inch

computer diskettes to the "routine border search" of other "closed containers." Id. at *5.  It held

that "agents were entitled to inspect the contents of the diskettes even absent reasonable

suspicion . . . ." Id.[6]

While the Ninth Circuit has not yet squarely held, like the courts in Ickes, Roberts, and

Irving, that computer searches at the border do not require reasonable suspicion, it has recently

answered affirmatively the question "whether, absent a search warrant or probable cause, the

contents of a laptop computer may be searched at an international border." United States v.

Romm, 455 F.3d 990, 993 (9th Cir. 2006).  In Romm, the defendant was denied entry to Canada

when Canadian immigration officials discovered evidence of child pornography websites on his

laptop computer.  Upon his re-entry to the United States, ICE agents conducted a forensic search

of the computer, which revealed images of child pornography.  The defendant unsuccessfully

challenged whether the computer search fell "under the border search exception." He alleged that

because he was denied entry to Canada, he was subject to an "official restraint"exception to the

border search doctrine.  Id. at 996-97.  The Court rejected this arguments and in doing so,

explained, "searches made at the border . . . are reasonable simply by virtue of the fact that they

occur at the border."  Id. (quoting Flores-Montano, 541 U.S. at 152-53) (internal quotation marks

omitted).  It thus concluded that "the routine border search of Romm's laptop was reasonable,

regardless whether Romm obtained foreign contraband in Canada or was under 'official

restraint.'"  Id.  Thus, while Romm is not dispositive, it nonetheless reiterates that Flores-

Montano was not limited to vehicle searches and thereby reinforces the conclusion that

computers, like other closed containers, may be searched at the border without reasonable

suspicion.

To support his claim that a search of a computer should be entitled to a heightened level

of scrutiny, the defendant cites to a number of cases in which courts addresses bodily intrusions

---

[6]    Like the district court in Roberts, the court in Irving also upheld the border search on the alternative
ground of reasonable suspicion without deciding whether the searches "were routine or non-routine."  United States
v. Irving, 452 F.3d 110, 124 (2006).

at the border which require a degree of suspicion prior to search.  What should go without saying is that a person's computer is simply not the same as one's bodily integrity.  As the Supreme Court explained in Wyoming v. Houghton, 526 U.S. 295 (1999), which dealt with the search of a passenger's purse in a car, there is a clear distinction between "searches of the person and searches of property."  Id. at 303 n.1.  While there may be "unique, significantly heightened protection afforded against searches of one's person," the search of property like a passenger's purse is constitutionally distinct because the "traumatic consequences" attendant to any search of the physical body "are not to be expected when the police examine an item of personal property" like a purse.  Id. at 303.  The same conclusion should apply to searches of computers.  Cf. Okafor, 285 F.3d at 845 (treating involuntary x-ray of a person at border differently than x-rays of objects at border).  It was a mistake to equate a computer search with a highly invasive body search and import the protections afforded to persons subject to invasive body searches to a much more limited computer search.  Whatever limitations the Fourth Amendment may impose on intrusive physical body searches at the border,[7] those limitations have not been extended to personal property -- whether it be luggage, a gas tank, or electronic computer files.

2. Computer Storage Devices Are Conceptually Identical to Closed Storage Containers.

For Fourth Amendment purposes, "[c]ourts have uniformly agreed that computers should be treated as if they were closed containers."  United States v. Al-Marri, 230 F. Supp. 2d 535, 541 (S.D.N.Y. 2002); accord United States v. Upham, 168 F.3d 532, 536 (1st Cir. 1999); Davis v. Gracey, 111 F.3d 1472, 1480 (10th Cir. 1997); Trulock, 275 F.3d at 403; United States v. Chan, 840 F. Supp. 531, 534 (N.D. Cal. 1993); United States v. Barth, 26 F. Supp. 2d 929, 936

---

[7]    The Supreme Court has "suggest[ed] no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches."  Montoya de Hernandez, 473 U.S. at 541 n.4.  The Ninth Circuit, however, has held that strip and body cavity searches, "unlike luggage searches and patdowns, must be supported by reasonable suspicion."  United States v. Gonzalez-Rincon, 36 F.3d 859, 864 (9th Cir. 1994).  Similarly, involuntary x-ray searches of the body must be supported by reasonable suspicion under the Ninth Circuit's precedents.  See United States v. Ek, 676 F.2d 379, 382 (9th Cir. 1982); Camacho, 368 F.3d at 1186 n.1.

1   (W.D. Tex. 1998); United States v. David, 756 F. Supp. 1385, 1390 (D. Nev. 1991); see also

2   United States v. Runyon, 275 F.3d 449, 458 (5th Cir. 2001) (both parties conceded that computer

3   disks are "containers" for Fourth Amendment purposes); but cf. United States v. Carey, 172 F.3d

4   1268, 1275 (10th Cir. 1999) (criticizing file cabinet analogy where police with search warrant for

5   only drug evidence expanded scope of computer search to child pornography evidence).  As the

6   Ninth Circuit has explained, "[c]omputers are simultaneously file cabinets (with millions of

7   files) and locked desk drawers; they can be repositories of innocent and deeply personal

8   information, but also of evidence of crimes."  United States v. Adjani, 452 F.3d 1140, 1152 (9th

9   Cir. 2006).

10         It follows, therefore, that because the contents of suitcases, purses, and briefcases can be

11   searched at the border without particularized suspicion, there is no reason to accord special

12   treatment to computers simply because they store information electronically.  It should not

13   matter, for instance, whether documents and pictures are kept in "hard copy" form in an

14   executive's briefcase or stored digitally in a computer.  The authority of customs officials to

15   search the former should extend equally to searches of the latter.  Indeed, this highlights one of

16   the critical flaws in the defendant's court's reasoning.  Had defendant carried with him in a

17   briefcase hard copies of the same pictures of child pornography that were contained on his

18   computer devices, there would be no doubt that a customs official could, without any suspicion,

19   search the contents of the briefcase and then seize any child pornography found during the

20   search.

21         The Arnold court's assumption that people value their electronic privacy over the privacy

22   rights they have in their physical possessions was unfounded.  Non-expressive materials carried

23   by passengers -- contraception devices, intimate attire, prescription medications, and so forth --

24   can reveal undisclosed details about sexual practices, personal hygiene, and physical health that

25   are just as private as what electronic data on a personal computer might reveal.  Yet these

26   physical items are routinely exposed during suspicionless border searches of luggage because the

27   privacy interests that inhere in such items must, at the border, yield to the government's

28   countervailing interest in border security.  There is thus no valid reason to afford greater Fourth

1  Amendment protection to computer storage devices at the border, since the invasion of privacy

2  attendant to computer searches is no more intrusive than that caused by searches of bags and

3  other closed containers.

4

5          3.      The Arnold Court's View of Computer Searches as Invasions of the Mind Lacks
                   Merit.

6

7          The Arnold court's analysis was further flawed because it rested on a faulty analogy

8  between computers and the human mind.  The computer is a tool for transferring our thoughts

9  and ideas to written word or graphical image; it is not the thought or idea itself.  Additionally,

10 the view of computers as interchangeable with our minds overlooks the fact that computers need

11 not be carried across the border at all.  The traveler alone decides what content to store on a

12 computer and, more to the point, whether to bring the computer across the border.  In the same

13 way that a traveler "may avoid exposing personal belongings . . . by simply leaving them at

14 home," O'Connor v. Ortega, 480 U.S. 709, 725 (1987), a traveler seeking entry into the United

15 States can avoid a search of his computer's contents by simply leaving the computer at home.

16

17     C.      **Suspicionless Computer Searches Are Essential to Vindicate the**
               **Government's Paramount Interest in Border Security**.

18

19         "Careful review of transit through our international borders is essential to national

20 security, health, and public welfare."  Okafor, 285 F.3d at 845.  If anything, the proliferation of

21 computers militates heavily in favor of, not against, suspicionless computer searches.  Customs

22 officials are generally charged with enforcing statutes that restrict importation of unlawful

23 materials without regard to the form, paper or electronic, that such materials may take.  See, e.g.,

24 19 U.S.C. § 1305 (prohibiting importation of treasonous, seditious, and obscene materials).  And

25 they are specifically empowered to enforce intellectual property laws, see, e.g., 19 C.F.R. §§

26 133.22 (trademarks), 133.42 (copyrights), in the course of which they must fairly be expected to

27 encounter documentary and digital materials stored on computers, compact discs, digital video

28 discs, and myriad other electronic storage devices.

A "[a] reasonable suspicion requirement in this context would remove the significant deterrent effect of suspicionless searches," Cortez-Rocha, 394 F.3d at 1120, and could actually encourage criminals to use computers as their smuggling container of choice.  See id. (reasonable suspicion requirement for cutting open spare tire would "encourage the use of spare tires and other locked containers as a means of smuggling"); United States v. Martinez-Fuente, 428 U.S. 543, 557 (1976) (reasonable suspicion requirement for fixed border checkpoints "would largely eliminate any deterrent to the conduct of well-disguised smuggling operations"); Ickes, 393 F.3d at 506 (creating exception for expressive materials on computers would create "a sanctuary at the border . . . even for terrorist plans" and "undermine the compelling reasons that lie at the very heart of the border search doctrine").  Just as physical contraband rarely will be strewn across the floor of a car or visibly exposed inside a suitcase "since by their very nature such goods must be withheld from public view," Ross, 456 U.S. at 820, graphic contraband like child pornography or pirated software is unlikely to be transported openly in "hard copy" format because would-be smugglers know that cars and luggage may be searched randomly without individualized suspicion.

Furthermore, defendant's request for preferential treatment of computer devices will lead to incongruous results.  An album of printed photographs could be randomly inspected at an international airport, e.g., Thirty-Seven Photographs, 402 U.S. at 365, but those same images saved on a digital camera's memory stick could not.  Compact discs or digital video discs shipped from overseas could be examined at a port of entry without any suspicion, e.g., 12 200-Ft. Reels of Super 8MM. Film, 413 U.S. at 124, but music and movies digitally downloaded on a computer hard drive would be off limits.

II.    ATTORNEY FILES - HARD COPY OR ELECTRONIC - HAVE NEVER BEEN AND SHOULD NOT BE INSULATED FROM SEARCHES BY THE GOVERNMENT.

Defendant asks this Court to disregard centuries of law and accept, without any legal support, his claim that attorneys, by virtue of their role as repositories of confidential communications, have a higher expectation of privacy and should not be subject to the same

search conditions as every other citizen. Before this Court even considers the defendant's argument, it should require the defendant to identify the purportedly privileged materials that impart the heightened level of privacy and protections that he claims. The defendant's argument is premised on the fact that the computer contained privileged matters yet he has not identified a single privileged document. Defendant admits that his motion is not premised on a violation of the attorney-client privilege. *Defendant's Memorandum*, p. 15. However, his motion is premised on the existence of privileged materials on the searched media and he should be required to substantiate that claim. By footnote, the defendant claims that he does not know if the government has violated the attorney-client and work product privileges because he was not present during the search of his belongings. *Defendant's Memorandum*, p. 15, n. 12. In fact, the defendant has had full access to the searched materials in the course of discovery and is more than able to identify any privileged materials. This Court should not permit the defendant to assert the attorney-client privileged as a basis for his right to a heightened degree of privacy without requiring the defendant to identify which documents are purportedly privileged.[8]

If the Court is inclined to consider the defendant's argument without this showing, the defendant's argument fails for several reasons.[9] Attorneys, like doctors, therapists, priests, and other persons who gain private, sensitive, and confidential information in the course of their profession, have been and are subject to reasonable searches - whether at a border, an office or a home. To the extent the search of the defendant's property was in violation of the Fourth Amendment, the remedy is not suppression but rather a consideration of what files, if any are privileged, and potential suppression of those files. Finally, the defendant's dire pronouncement that border searches of attorney computers will impact the ability and confidence of clients to

---

[8] The electronic media in question has remained in the custody of the United States pursuant to Title 18, United States Code, section 3509(m) ("In any criminal proceeding, any property or material that constitutes child pornography . . . shall remain in the care, custody, and control of either the Government or the Court."). However, the defendant has had full access to review the media and its contents. To comply with the mandates of Title 18, United States Code, section 3509(m), the United States suggests that it make the media available to the Court for it to review with the list of allegedly privileged materials to be provided by the defendant.

[9] In support of his position, the defendant relies on <u>United States v. Arnold</u>, <u>see</u> *Defendant's Memorandum* at p. 12. The <u>Arnold</u> case does not address the search of an attorney computer and defendant's citation to this case is misplaced

1  convey information to attorneys based is a nonsensical, unsupported prediction.

3  **A.    Attorneys Files Are Subject to Reasonable Searches Like Any Other Property**.

5  The Fourth Amendment does not grant the defendant an exemption from a reasonable

6  search by virtue of his status as an attorney and a potential repository of privileged

7  communications.  The Fourth Amendment provides for

8  > the right of people to be secure in their persons, house, papers, and
   > effects, against <u>unreasonable</u> searches and seizures, shall not be
9  > violated . . . .

10  U.S. Constitution, Article IV (emphasis added).   Attorney files have always been subject to and

11  are not immune from search.  <u>United States v. Mittleman</u>, 999 F.2d 440, 445 (9th Cir. 1993)

12  ("Law offices are not immune from search."); <u>see e.g</u>, <u>Andresen v. Maryland</u>, 427 U.S. 463, 465

13  (1976) (search of attorney law office pursuant to search warrant); <u>In re Grand Jury Subpoenas</u>

14  <u>Dated December 10, 1987</u>, 926 F.2d 847, 851-52 (9th Cir. 1991) (searching two offices of law

15  firm pursuant to search warrants); <u>United States v. Friedman</u>, 210 F.3d 227 (4th Cir. 2000)

16  (search of attorney briefcase pursuant to search warrant); <u>United States v. Humphreys</u>, 982 F.2d

17  254, 259  (8th Cir. 1993)(search of attorney's office pursuant to search warrant).  Rather than

18  carve out a new rule for searching an attorney's files, the courts have simply provided that the

19  search must be conducted reasonably, consistent with the dictates of the Fourth Amendment.

20  <u>Mittleman</u>, 999 F.2d at 445 (acknowledging that although a search of known attorney files

21  should be undertaken carefully, special legal rules are not necessary for such searches).

22  In the course of a reasonable search, even if an attorney asserts that the files being

23  searched are privileged, that assertion alone will not limit the ability of the agents to continue

24  with the search.  In <u>United States v. Friedman</u>, agents obtained a search warrant to search the

25  contents of briefcases known to belong to an attorneys.  The defendant moved to suppress

26  claiming that the search warrant pursuant to which the briefcases were searched failed to include

27  reference to the known fact that the defendant was an attorney and the fact that defendant had

28  asserted the attorney-client privilege with respect to the documents in his briefcase.  210 F.3d

227, 229 (3d Cir. 2000).  The Circuit could held that the fact that the attorney was an attorney or that his briefcase contained privileged files did not impact the ability of the agents to search the briefcase.

> The fact remains that the question whether a document is privileged has nothing at all to do with the separate question whether there existed probable cause to justify the issuance of a warrant to seize that document.  In other words, the probable cause determination would not have changed in the slightest had the warrant affidavit at issue made clear that [the defendant] had asserted the attorney/client privilege with respect to some of the documents seized.

Id. at 229-30.

Defendant claims that he told Officer Edwards that he was an attorney and advised her of the nature of the materials in his possession.  The Declarations of Officer Edwards and Cross directly refuted the defendant's claims show that the defendant's declaration should be regarded with great suspicion.  But, even if the defendant did tell the agents that he was an attorney and did tell the agents that the media contained attorney-client privileged materials, the analysis is still the same.  His status as an attorney and the existence of privileged files is irrelevant. Although the existing case law addresses attorney searches resulting from search warrants, the concept is identical.  In non-border cases, when law enforcement sought to search attorney files, the search was a "reasonable" one in which a search warrant was obtained pursuant to normal search warrant procedure.  The fact that attorney files were being searched did not require a separate and distinct procedure.[10]

**B.    A Border Search of Attorney Files is Not An Unreasonable Search In Violation of the Fourth Amendment**.

The defendant alleges that the sanctity of the attorney-client privilege affords an attorney a heightened expectation of privacy.  In essence, the defendant is asking this court disregard the

---

[10]   The defendant cites a Department of Justice policy in which the Department cautions agents to exercise "special care" when planning a computer search that may result in the seizure of legally privileged documents. *Defendant's Memorandum*, p. 22.  Department of Justice admonishments to proceed with caution cannot realistically be regarded as any sort of recognition that attorneys are subject to a higher expectation of privacy or otherwise subject to a separate standard of review prior to issuance of a search warrant.

1    long-recognized and paramount national interest in protecting the borders of the United States

2    and place that compelling interest below the interests of attorneys in maintaining client

3    confidences.

4      1. <u>Attorneys, Like Other Travelers, Have a Lesser Expectation of Privacy at the</u>

5        <u>Border</u>.

6      Courts have consistently recognized that travelers do not have the same expectations of

7    privacy in their possessions and persons at the borders, as they would at other locales. <u>See</u> <u>infra</u>

8    I.A.2. Attorneys do not, and should not, as the defendant contends have a heightened

9    expectation of privacy at the border. Candidly, the defendant admits that there is not a single

10   federal case that addresses the border search of attorney computer. However, the one case cited

11   by defendant, <u>United States v. Modes</u>, details a border search of privileged attorney files;

12   recognizes the border search exception to the Fourth Amendment; and condones the search of

13   the attorney files at the border. <u>See</u> <u>United States v. Modes</u>, 787 F. Supp. 1466, 1475 (Ct. Int'l

14   Trade 1992). Contrary to the defendant's contention, the <u>Modes</u> court did <u>not</u> condemn the

15   search of the purportedly privileged files; the court held that the seizure and detention of the files

16   was improper. <u>Id.</u> In <u>Modes</u>, customs agents served subpoenas on the defendant and his

17   attorney seeking production of records in early May 1985. Defense counsel informed the

18   investigating customs case agent that they needed additional time to respond to the subpoenas

19   and that he and an investigator would be traveling to Taiwan to conduct an internal investigation

20   and gather information pertinent to the customs investigation. In late May 1985, on his return

21   from Taiwan, while waiting to clear customs, the investigator's briefcase was searched. The

22   investigator told the customs agents that he worked for an attorney and that the files in his

23   briefcase were attorney-client and work product protected files pertinent to a customs

24   investigation. <u>Id.</u> at 1468-69. After the search, which revealed no contraband, a customs

25   supervisor detained the files and forwarded them to the investigating case agent.

26     The <u>Modes</u> court acknowledged that the privileged materials were properly searched

27   pursuant to the authority vested in customs officials. <u>Id.</u> at 1474. The court held that the initial

28   inspection was "founded on mere suspicion" of a reasonable nature based on the passenger's

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH

travel from a source country, his declaration of money exceeding the allowed amount, and that he was a consultant. Id. at 1475. Although the United States believes that the Modes court improperly implied that a level of "mere suspicion" was necessary for a border search, the fact remains that the court found that the search was proper and did not require, as the defendant suggestion, a heightened level of reasonable suspicion to conduct the search of the attorney files. The court condemned the seizure and detention of the files because after the search, the agents did not find any incriminatory materials that would justify detention of the files. Id. at 1475.

Attorneys and attorney files existed at the time the Fourth Amendment and the customs statutes authorizing suspicionless and warrantless border were drafted. Tellingly, the Framers did not chose to except attorney files from search, impart a higher degree of suspicion before attorney files can be drafted, or acknowledged a heightened level of privacy of attorneys.

> 2.      The Container In Which the Defendant's Files Were Housed Does Not Impact the Analysis.

Defendant alleges that attorneys have a heightened expectation to privacy due to the fact that data is stored on a computer, rather than a written file. *Defendant's Memorandum*, p. 17. Not only is the defendant's argument devoid of any support, it is in directly contrary to the wealth of well-established law holding that for Fourth Amendment purposes, a computer should be treated as if they were closed containers. See infra I.B.2. In an effort to gain a foothold for his tenuous position, the defendant advises that the California State Bar has recognized that privileged materials can be contained in electronic format. The fact privileged material can be contained in electronic format does not render electronic documents deserving of any higher level of protection than a legal pad with an attorney's trial strategy.

> 3.      The Search of the Defendant's Electronic Data Was Reasonable.

Insofar as the Fourth Amendment precludes unreasonable searches, any search is properly reviewed for reasonableness. The CBP agents did not engage in a widespread, unfettered search to seek out and discern the contents of any privileged materials that the

1    defendant may have been carrying.  Each of the officers  has described the manner in which they

2    searched the electronic media.  Officer Cross stated that he reviews for images files.  *Cross*

3    *Decl.*, ¶ 5.  Officer Edwards stated that she opens the files in a thumbnail view and searches

4    specifically for contraband.  *Edwards Decl.*, ¶ 11.  Each officer proceeded in a reasonable and

5    purposeful manner to determine whether the defendant was carrying contraband into the United

6    States.  The defendant contends that because a search of a computer can discover deleted files, it

7    is therefore unreasonable.  *Defendant's Memorandum*, p. 18.  What defendant disregards is the

8    reality that computers have been searched in this manner for years and to date, no court has ruled

9    that the fact that deleted files can be recovered renders a search unreasonable.  For all of these

10   reasons, the United States contends that the search of the defendant's computer was conducted in

11   a reasonably and appropriate manner and that the information obtained therefrom should not be

12   suppressed.

13

14   **C.    Suppression Is Not the Remedy For An Impermissible Search of Attorney-Client**

15   **Privileged Files**.

16          Rather than work within the established practice that ensures that privileged materials, if

17   obtained by the government, are not impermissibly used, defendant asks this Court to create a

18   new standard that attorney files - privileged or not - are entitled to a heightened expectation of

19   privacy in attorney files and condemn the search as a whole.  If a search of attorney files does

20   unreasonably intrude upon privileged materials, the remedy is exclusion of the privileged

21   documents, not suppression.  Mittleman, 999 F.2d at 445 (requiring suppression of only those

22   materials that were outside the scope of the lawfully obtained warrant).  If the CBP Officers

23   searched and seized privileged materials, the defendant is required to identify these documents

24   and request an *in camera* review.  See  In re Grand Jury Subpoenas Dated December 10, 1987,

25   926 F.2d 847, 858-59 (9th Cir. 1991)(upon defendant's assertion of privilege as to the documents

26   obtained pursuant to search warrant, the court reviewed the documents in camera and determined

27   that no privilege applied); see also United States v. Humphreys, 982 F.2d 254, 259 (8th Cir.

28   1993) (to avail himself of a remedy, the defendant must identify which documents were privilege

for the district court to review and make a determination).  The defendant bears the burden to identify the documents and substantiate the basis for the privilege.  "The party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication."  Ralls v. United States, 52 F.3d 223, (9th Cir. 1995); United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1993) (upon raising the issue of privilege, the defendant is required to show which documents are privileged).  In Humphreys, the defendant claimed that privileged files were seized during execution of a search warrant at his law office and that these materials were being used against him.  In ruling against the defendant, the court stated that the defendant "provided nothing more than speculation and contradictory statements.  No file or documents were produced for review of the district court . . . . Even if the search was overbroad in scope, no showing of its effect upon the prosecution has been made."  Humphreys, 982 F.2d at 259.

Like in Humphreys, the defendant has not, identified a single document that was on his laptop and that was subject to the attorney-client privilege.  This Court should not permit the defendant to assert the attorney-client privileged as a basis for his right to a heightened degree of privacy without requiring the defendant to identify which documents are purportedly privileged.

**D.    The Potential To Search An Attorney's Files Does Not Impact the Attorney-Client Relationship**.

Permitting searches of an attorney's computer is not the "Brave New World" scenario that the defendant portends.  Attorney files have been subject to search for centuries and yet clients have continued to speak freely with their attorneys and seek out legal advice.  First, as the concept of the border search contemplates, the customs authorities are seeking to prevent the introduction of contraband, not attorney-client privileged communications, into the United States.  The searches are undertaken carefully to determine if contraband is present and if not, the travelers belongings are released.  Further, with respect to border searches, by defendant's own admission, "the number of travelers to whom this protection will apply is a tiny fraction of international passengers."  See Defendant's Memorandum, p. 21.  Accordingly, the number of

attorneys who travel internationally with client confidences would be quite limited and the clients whose fear of compelled disclosure by their attorneys in the course of international travel would be a small population. The limited number of persons potentially affected under defendant's analysis does not warrant this Court uprooting centuries of law condoning and approving the practice of border searches.

III.    THE DEFENDANT IS NOT ENTITLED TO AN EVIDENTIARY HEARING.

"An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." United States v. Howell, 231 F.3d 615, 620 (9th Cir. 2000). An evidentiary hearing is not permitted, as the defendant requests, to "present and develop further evidence in support of" his Motion. *Defendant's Notice of Motion*. As set forth above, the defendant has failed to allege with any particularity that privileged documents even existed on the laptop computer. The broad assertions by the defendant and his business partner, Mr. Stern, of the existence of these documents without identifying a single one do not rise to the level of "definiteness, clarity, and specificity" necessary for this Court to entertain holding an evidentiary hearing. Moreover, the issues raised by the defendant are entirely legal, not factual, and do not require testimony for this Court to rule on the Motion. Finally, even if this Court assumes all the facts in the defendant's Declarations to be true, the outcome is the same. For all of these reasons, the defendant is not entitled to an evidentiary hearing on his Motion to Suppress.

//
//
//
//
//
//

1   //

2   //

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH

**CONCLUSION**

The defendant has failed to make the threshold showing for this Court to grant an evidentiary hearing insofar as no material issues of contested fact exist.  Further, for the reasons set forth above and those to be stated at a hearing on this Motion, the defendant's Motion to Suppress should be denied.

Date:    March 7, 2008.

Respectfully Submitted,

JOSEPH P. RUSSONIELLO
United States Attorney


_____/s/_____
DENISE MARIE BARTON
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

     The undersigned hereby certifies that she is an employee of the office of the United States Attorney, Northern District of California and is a person of such age and discretion to be competent to serve papers.  The undersigned certifies that, on March 7, 2008, she served a copy of the foregoing document described as:

**MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE AND REQUEST FOR AN EVIDENTIARY HEARING**

   X    Via email (due to the ECF system maintenance on March 7, 2008) on the parties as set forth below:

**Craig H. Bessenger**
**Clarence & Dyer LLP**
**899 Ellis Street**
**San Francisco, CA 94109**
**415.749.1800**
**415.749.1694 (fax)**
**cbessenger@clarencedyer.com**

**Edwin Ken Prather**
**Clarence & Dyer LLP**
**899 Ellis Street**
**San Francisco, CA 94109**
**(415) 749-1800**
**(415) 749-1694 (fax)**
**eprather@clarencedyer.com**

**Nanci L. Clarence**
**Clarence & Dyer LLP**
**899 Ellis Street**
**San Francisco, CA 94109**
**415-749-1800**
**415-749-1694 (fax)**
**nclarence@clarencedyer.com**

     I declare under penalty of perjury that the foregoing is true and correct.

Dated:   March 7, 2007

                 /s/
                 DENISE BARTON
                 United States Attorney's Office