JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney

BRIAN STRETCH (CSBN 163973)
Chief, Criminal Division

DENISE MARIE BARTON (MABN 634052)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-7359
Facsimile: (415) 436-7234
denise.barton@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No.  07-0594 PJH |
| | ) |
|     Plaintiff, | ) MEMORANDUM IN OPPOSITION TO |
| | ) MOTION TO SUPPRESS EVIDENCE AND |
| v. | ) REQUEST FOR AN EVIDENTIARY |
| | ) HEARING[1] |
| JEFFREY HARRISON, | ) |
| | ) Hearing Date:  April 9, 2008, 2:30 pm |
|     Defendant. | ) Courtroom:    17-3 |
| _____ | ) |

[1] Per Order of the Court dated February 15, 2008 (ECF Document No. 54), this Memorandum is due March 7, 2008.  The ECF system ordinarily permits filing up to 11:59 pm on the day of filing.  The ECF system went off-line at 6:00 pm on March 7, 2007 for maintenance and the United States was unable to electronically file and serve this Memorandum on March 7, 2008 via the ECF system.  However, to ensure that defense counsel was served with the United States Memorandum in compliance with the Court's Order, counsel for the United States served defense counsel by email on March 7, 2008, as the ECF system would have done if it had been operational.

1

# TABLE OF CONTENTS

2
Page No.

3
TABLE OF AUTHORITIES

4

5
FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6
ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7

8
I.    COMPUTERS AND OTHER ELECTRONIC STORAGE DEVICES ARE SUBJECT
      TO SEARCH AT THE BORDER AND DO NOT REQUIRE REASONABLE

9     SUSPICION AS A PREDICATE TO SEARCH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

10

11    A.    Customs Officials Have Longstanding Plenary Authority under the Fourth
            Amendment to Conduct Suspicionless Searches of Personal Property at the

12          International Border. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

13

14          1.    Suspicionless Border Searches of Property Are Deeply Embedded in the
                  Nation's History and Justified by the Government's Paramount Interest in

15                Border Security. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16

17          2.    Travelers Crossing the Border Have a Substantially Diminished
                  Expectation of Privacy in Their Personal Belongings and Effects. . . . . . 6

18

19          3.    Searches of Closed Containers and Items of Personal Property Contained
                  Therein May Be Conducted Without Particularized Suspicion. . . . . . . . . 7

20

21          4.    The Defendant Relies on a Discarded Distinction Between "Routine" and
                  "Non-Routine" Border Searches of Property. . . . . . . . . . . . . . . . . . . . . . 8

22

23    B.    Computer Storage Devices Are Neither Conceptually Nor Constitutionally

24          Different than Other Closed Storage Containers Subject to Suspicionless Border

25          Searches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

26

27          1.    Courts Have Recognized That No Suspicion Is Required to Search
                  Computer Media at the Border. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28

**TABLE OF CONTENTS (Cont'd)**

Page No.

2.    Computer Storage Devices Are Conceptually Identical to Closed

Storage Containers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3.    The Arnold Court's View of Computer Searches as Invasions of the Mind

Lacks Merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C.    Suspicionless Computer Searches Are Essential to Vindicate the Government's

Paramount Interest in Border Security. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.  ATTORNEY FILES - HARD COPY OR ELECTRONIC - HAVE NEVER BEEN AND
SHOULD NOT BE INSULATED FROM SEARCHES BY THE GOVERNMENT. . . . 16

A.    Attorneys Files Are Subject to Reasonable Searches Like Any Other Property. . 17

B.    A Border Search of Attorney Files is Not An Unreasonable Search In Violation of

the Fourth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1.    Attorneys, Like Other Travelers, Have a Lesser Expectation of Privacy at

the Border    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

2.    The Container In Which the Defendant's Files Were Housed Does Not

Impact the Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.    The Search of the Defendant's Electronic Data Was Reasonable. . . . . . . 21

C.    Suppression Is Not the Remedy For An Impermissible Search of Attorney-Client

Privileged Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.    The Potential To Search An Attorney's Files Does Not Impact the Attorney-

Client Relationship. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1

**TABLE OF CONTENTS (Cont'd)**

2

Page No.

3

4

III.   THE DEFENDANT IS NOT ENTITLED TO AN EVIDENTIARY HEARING.. . . . . 23

5

6

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7

8

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page No.

**FEDERAL CASES**

*Andresen v. Maryland*, 427 U.S. 463  (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Boyd v. United States*, 116 U.S. 616 (1886). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Carroll v. United States*, 267 U.S. 153 (1925). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Davis v. Gracey*, 111 F.3d 1472 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Henderson v. United States*, 390 F.2d 805 (9th Cir. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

*In re Grand Jury Subpoenas*, 926 F.2d 847 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*O'Connor v. Ortega*, 480 U.S. 709 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ralls v. United States*, 52 F.3d 223 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Witt v. United States*, 287 F.2d 389 (9th Cir. 1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wyoming v. Houghton*, 526 U.S. 295 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Barth*, 26 F. Supp. 2d 929 (W.D. Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Chan*, 840 F. Supp. 531 (N.D. Cal. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. David*, 756 F. Supp. 1385 (D. Nev. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Runyon*, 275 F.3d 449 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**TABLE OF AUTHORITIES (Cont'd)**

Page No.

*United States v. Upham*, 168 F.3d 532 (1st Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Al-Marri*, 230 F. Supp. 2d 535 (S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Arnold*, 454 F. Supp. 2d 999 (C.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Borello*, 766 F.2d 46 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Camacho*, 368 F.3d 1182  (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*United States v. Chaudhry*, 424 F.3d 1051 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Cortez-Rocha*, 394 F.3d 1115 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 9, 15

*United States v. Ek*, 676 F.2d 379 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Flores-Montano*, 424 F.3d 1044 (9th Cir. 2005) (per curiam). . . . . . . . . . . . . . 9

*United States v. Flores-Montano*, 541 U.S. 149 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*United States v. Fortna*, 796 F.2d 724 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Friedman*, 210 F.3d 227 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Gonzalez-Rincon*, 36 F.3d 859 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Grayson*, 597 F.2d 1225 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Guadalupe-Garza*, 421 F.2d 876 (9th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . 6, 7

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Humphreys*, 982 F.2d 254 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

**TABLE OF AUTHORITIES (Cont'd)**

Page No.

*United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

*United States v. Irving*, 2003 WL 22127913. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Irving*, 452 F.3d 110 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Martinez-Fuente*, 428 U.S. 543 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Mittleman*, 999 F.2d 440 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . 17, 18, 21, 22

*United States v. Modes*, 787 F. Supp. 1466  (Ct. Int'l Trade 1992). . . . . . . . . . . . . . . . . . . 19, 20

*United States v. Molina-Tarazon*, 279 F.3d 709 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Okafor*, 285 F.3d 842  (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12, 15

*United States v. Roberts*, 274 F.3d 1007 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Roberts*, 86 F. Supp. 2d 678 (S.D. Tex. 2000). . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States v. Romm*, 455 F.3d 990 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Ross*, 456 U.S. 798 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15

*United States v. Schoor*, 597 F.2d 1303 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Thirty-Seven Photographs*, 402 U.S. 363 (1971). . . . . . . . . . . . . . . . . . . 6, 7, 15

*United States v. Tsai*, 282 F.3d 690 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Villamonte-Marquez*, 462 U.S. 579 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. 12 200-Ft. Reels of Super 8mm Film*, 413 U.S. 124 (1973). . . . . . . . . . . . . 7, 16

**TABLE OF AUTHORITIES (Cont'd)**

Page No.

**FEDERAL STATUTES**

19 U.S.C. § 1305. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

19 U.S.C. § 1461. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

19 U.S.C. § 1496. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

19 U.S.C. § 1582. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5


**FEDERAL REGULATIONS**

19 C.F.R. § 101.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

19 C.F.R. § 162.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

19 C.F.R. § 133.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

19 C.F.R. §133.42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1    The defendant now seeks to suppress child pornography images found on his laptop
2   computer and other electronic storage devices.  The child pornography was discovered in the
3   course of a lawful border search of the defendant's belongings when he entered the United States
4   at San Francisco International Airport from the Philippines.  First, in patent disregard of the
5   well-established border search exception to the Fourth Amendment, the defendant incorrectly
6   claims that computers are not subject to suspicionless border searches.  In support of this issue,
7   the defendant relies on a faulty argument that was has only been articulated in one case - United
8   States v. Arnold, 454 F. Supp. 2d 999 (C.D. Cal. 2006).  As set forth below, the Arnold decision,
9   currently on appeal in the Ninth Circuit, is a poorly decided case that completely disregards
10  well-established Supreme Court and Ninth Circuit law and cannot be the basis to overturn
11  centuries of long-standing law authorizing the suspicionless search of a persons's belongings
12  upon entry into the United States.  Next, the defendant asserts, without any legal or logical
13  support, that an attorney's computer should not be subject to a suspicionless border search.  The
14  defendant claims that attorney computers should not be searched absent a quantum of
15  "reasonable suspicion."  Defendant takes this unique position notwithstanding the fact that not a
16  single court has stated that attorneys, or their computers, are subject to greater Fourth
17  Amendment protections than other persons.  In fact, courts across the country have recognized
18  that attorneys - inside the country and at the border - are subject to search on the same terms and
19  conditions any other person.

20                              **FACTUAL BACKGROUND**

21    On July 1, 2007, the defendant arrived at San Francisco International Airport (SFO).
22  *Harrison Declaration*, ¶ 2; *Exhibit D to Defendant's Motion (ECF Document No. 50)*, JH064
23  (Customs and Border Protection Officer Reports).  After claiming his luggage, the defendant was
24  referred for secondary inspection.  *Harrison Decl.*, ¶ 7.  During secondary inspection, Customs
25  and Border Protection officers inspect the belongings of international passengers for contraband.
26  *Declaration of Sheryl Edwards,* ¶ 2 (attached as Exhibit A ).  At the secondary inspection point,
27  the defendant encountered Customs and Border Protection (CBP) Officer Sheryl Edwards.
28  *Edwards Decl.*, ¶ 3 .  Officer Edwards observed that the defendant was upset that he had been

referred to secondary inspection. *Edwards Decl.*, ¶ 3. In speaking with the defendant, Officer Edwards learned that the defendant had returned from a 10 day business trip from the Philippines and that he was the owner of a company called Global Mobile Technologies. *Edwards Decl.*, ¶ 4. Officer Edwards noted that the defendant had a large amount of luggage for a 10 day business trip. *Edwards Decl.*, ¶ 4. Officer Edwards does not recall the defendant telling her that he was an attorney or describing his legal work. *Edwards Decl.*, ¶ 5.

While at the secondary inspection area, Officer Edwards began to search the defendant's belongings and found a number of CD-Rs in plastic sleeves. On one of the CD-Rs, she saw what she believed to be a questionable photocopy of the Microsoft logo, causing her to question if the CD-R contained contraband pirated software. *Edwards Decl.*, ¶ 7. When discussing the CD-Rs with the defendant, the defendant told Officer Edwards that the CD-Rs were business-related. He did not tell her that the CD-Rs contained any legal files or privileged materials. *Edwards Decl.*, ¶ 7.

Officer Edwards requested assistance from another CBP Officer, Officer Joshua Cross, to search the defendant's belongings. *Edwards Decl.*, ¶ 8; *Declaration of Joshua Cross,* ¶ 2 (attached as Exhibit B). Officer Edwards knew that the defendant was returning from a country known for child sex tourism and child pornography, which can easily be transported on electronic media, and had observed a suspect Microsoft logo with a CD-R which could have contained pirated software. *Edwards Decl., ¶ 8*. When Officer Edwards began to leave the secondary inspection area with the defendant's CD-Rs to review the CD-Rs, the defendant became agitated that she was leaving with the CD-Rs, tried to follow her, and had to be told to stay where he was by another CBP Officer. *Edwards Decl., ¶ 9*. The defendant's reaction to Officer Edwards leaving with the CD-Rs gave her further suspicion. *Edwards Decl., ¶ 9*.

Officer Edwards took the CD-Rs to the CBP Office to view the CD-Rs on the CBP computer. *Edwards Decl.*, ¶ 9. When reviewing the CD-Rs, Officer Edwards opened the CD-Rs in thumbnail format – a small view of all files – so that she could quickly view the files and search for contraband. *Edwards Decl.*, ¶ 11. Officer Edward's practice is to view the files in thumbnail view and open them if the image appears to be contraband. *Edwards Decl.*, ¶11.

When reviewing the defendant's CD-Rs, Officer Edwards discovered child pornography images. *Edwards Decl.*, ¶ 11.

Officer Cross, not Officer Edwards, searched the defendant's laptop computer. *Edwards Decl.*, ¶ 10; *Cross Decl.*, ¶ 3. Officer Edwards was not even present when Officer Cross was searching the computer. *Edwards Decl.*, ¶ 10; *Cross Decl.*, ¶ 3. Before he began searching the defendant's computer, Officer Cross asked the defendant who had access to the computer; the defendant responded that he, his business partner, his son, and his son's roommate all had access to the computer. *Cross Decl.*, ¶ 10. When searching computers, Officer Cross asks a traveler to enter the computer password. Consistent with this practice, he asked the defendant to enter his computer password and the defendant did, without issue. *Cross Decl.*, ¶ 4. Officer Cross has no memory of the defendant ever telling him that the computer contained attorney-client privileged materials. *Cross Decl.*, ¶4. If the defendant had made that statement, Officer Cross would have contacted a supervisor. *Cross Decl.*, ¶ 3.

When searching the computer, Officer Cross reviewed the computer for image files, specifically picture and video files. *Cross Decl.*, ¶ 5. During his search, Officer Cross discovered an image that he believed to be child pornography. *Cross Decl.*, ¶ 5.

**ARGUMENT**

I. COMPUTERS AND OTHER ELECTRONIC STORAGE DEVICES ARE SUBJECT TO SEARCH AT THE BORDER AND DO NOT REQUIRE REASONABLE SUSPICION AS A PREDICATE TO SEARCH.

Defendant is flatly wrong in his argument that computers cannot be searched at the border absent reasonable suspicion. Although such all searches must be "reasonable" in accordance with the Fourth Amendment, a "reasonable" search does not require "reasonable suspicion." The reasonableness of a search is assessed in terms of the nature of the search. The Supreme Court and Ninth Circuit have repeatedly held that border searches of property, done without any quantum of suspicion, are reasonable under the Fourth Amendment and thereby permissible.

**A. Customs Officials Have Longstanding Plenary Authority under the Fourth Amendment to Conduct Suspicionless Searches of Personal Property at the International Border**.

"Time and again," the Supreme Court has "stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" United States v. Flores-Montano, 541 U.S. 149, 152-53 (2004) (quoting United States v. Ramsey, 431 U.S. 606, 616 (1977)). The suspicionless border search rule has a history as old as the Fourth Amendment itself and is justified by the nation's longstanding right to protect itself. Moreover, as a corollary of the government's sovereign interest in protecting its borders, travelers have a substantially reduced expectation of privacy when crossing the international border. Hence, as the Ninth Circuit explained four decades ago, "it is too well established to require citation of authority that [border] searches are unique, that the mere fact that a person is crossing the border is sufficient cause for a search[,]" that "every person crossing our border may be required to disclose the contents of his baggage," and that "[e]ven 'mere suspicion' is not required." Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967).

The defendant now asks this Court to disregard well-settled principles and ignore controlling precedent upholding suspicionless property searches at the border, relying solely on the case of United States v. Arnold, a poorly decided district court case from the Central District of California that is currently on appeal. The Arnold case is not, as the defendant states, "controlling law in the Ninth Circuit." See *Defendant's Memorandum of Points and Authorities in Support of Motion to Suppress*, p. 7.

       1.    <u>Suspicionless Border Searches of Property Are Deeply Embedded in the Nation's History and Justified by the Government's Paramount Interest in Border Security.</u>

The authority of customs officers to conduct warrantless, suspicionless searches at the border predates the adoption of the Fourth Amendment and has long been recognized as a

concomitant aspect of the sovereign's interest in controlling its borders..[2]  See United States v. Villamonte-Marquez, 462 U.S. 579, 585 (1983) (stating government's authority to conduct warrantless border searches has an "impressive historical pedigree"); Witt v. United States, 287 F.2d 389, 391 (9th Cir. 1961) ("[D]ifferent rules are applicable, and for over a hundred years have been applicable with respect to the plenary power to search at the border and the more circumscribed power existing anywhere else within the country's boundaries.").  Today, this plenary search authority can be found in the modern statutes, including Title 19, United States Code, sections 1496 and 1582, that, like their historical antecedent, authorize customs officers to search -- without individualized suspicion -- the contents of people's luggage.[3]  The suspicionless border searches authorized by these modern statutes thus have "a history as old as the Fourth Amendment itself," Ramsey, 431 U.S. at 619, and are accordingly compatible with

_____

[2]  The nation's earliest customs statute, Act of July 31, 1789, ch. 5, 1 Stat. 29, was enacted two months before Congress proposed the Bill of Rights, including the Fourth Amendment, to the states.  See Ramsey, 431 U.S. at 616.  The 1789 Act granted customs officials "full power and authority" to enter and search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed," whereas in contrast, searches of any "particular dwelling-house, store, building, or other place" were authorized only with a warrant upon "cause to suspect."  Id. at 616 n.12 (quoting text of statute).  Because this statute, which recognized "plenary customs power" to conduct warrantless inspections of vessels, was passed by the same Congress that promulgated the Fourth Amendment, "it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable.'"  Id. at 616-17 (quoting Boyd v. United States, 116 U.S. 616, 623 (1886)).

[3]  See, e.g., 19 U.S.C. § 1496 (the "appropriate customs officer may cause an examination to be made of the baggage of any person arriving in the United States in order to ascertain what articles are contained therein and whether subject to duty, free of duty, or prohibited notwithstanding a declaration and entry therefor has been made"); 19 U.S.C. § 1582 (the "Secretary of the Treasury may prescribe regulations for the search of persons and baggage . . .; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations"); see also 19 U.S.C. § 1461 (for "merchandise and baggage imported or brought in from any contiguous country," customs officers may require opening for inspection of "any trunk, traveling bag, sack, valise, or other container").  Among the relevant regulations implementing § 1582, 19 C.F.R. § 162.6 provides, in pertinent part, that "[a]ll persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer."  The "Customs territory of the United States" includes the 50 states, the District of Columbia, and Puerto Rico.  19 C.F.R. § 101.1.

1   the Fourth Amendment.

2       The greater authority to search persons and property crossing the United States border

3   stems directly from the government's paramount interest in protecting the security and integrity

4   of its borders.  See Flores-Montano, 541 U.S. at 153 ("It is axiomatic that the United States, as

5   sovereign, has the inherent authority to protect, and a paramount interest in protecting, its

6   territorial integrity.").  The border is where the government must be the most vigilant to

7   "interdict those who would further crime, introduce matter harmful to the United States, or even

8   threaten the security of its citizens."  United States v. Okafor, 285 F.3d 842, 845 (9th Cir. 2002).

9   To discharge this broad and critically important mandate, customs officials have necessarily

10  enjoyed plenary authority to search, without reasonable suspicion, all types of private belongings

11  and effects presented for entry at the border that would otherwise ordinarily be protected against

12  suspicionless searches if done in the interior of the country.  See Carroll, 267 U.S. at 153-54; 12

13  200-Ft. Reels of Super 8MM. Film, 413 U.S. at 125; United States v. Thirty-Seven Photographs,

14  402 U.S. 363, 376 (1971).

15

16      2.    Travelers Crossing the Border Have a Substantially Diminished Expectation of
17            Privacy in Their Personal Belongings and Effects.

18      Consistent with the government's intrinsic right to examine persons and things entering

19  the country, "the Fourth Amendment's balance of reasonableness is qualitatively different at the

20  international border than in the interior."  Montoya de Hernandez, 473 U.S. at 538.  Travelers

21  crossing the border do not have the same expectation of privacy that they otherwise enjoy in the

22  interior of the country.  See Flores-Montano, 541 U.S. at 154 (privacy expectation is "less at the

23  border than it is in the interior").  As this Circuit has explained, a traveler into the United States

24  must anticipate that he will be detained temporarily at the border," that "[h]e will be

25  interrogated," and that "[h]is vehicle, if any, and his personal effects will be examined." "

26  United States v. Guadalupe-Garza, 421 F.2d 876, 878 (9th Cir. 1970).

27      The defendant, as did the court in Arnold, completely disregards the substantially

28  diminished privacy interests at stake in border searches.  The "protection afforded by the

[Fourth] Amendment varies in different settings."  United States v. Ross, 456 U.S. 798, 823

(1982). "Among the circumstances to be considered is the place of the search," for a person's

reasonable expectation of privacy "differs" significantly if the place of search is "the home, the

street, the telephone booth, or the border." Guadalupe-Garza, 421 F.2d at 878. Thus, even

though the contents of a person's luggage may be otherwise private, "[t]he luggage carried by a

traveler entering the country may be searched at random by a customs officer[.]" Ross, 456 U.S.

at 823. And "the luggage may be searched no matter how great the traveler's desire to conceal

the contents may be." Id. "[D]ifferent considerations and different rules of constitutional law"

apply at the border, 12 200-Ft. Reels of Super 8MM. Film, 413 U.S. at 125, because "a port of

entry is not a traveler's home." Thirty-Seven Photographs, 402 U.S. at 376.


        3.      Searches of Closed Containers and Items of Personal Property Contained Therein
              May Be Conducted Without Particularized Suspicion.

By virtue of their longstanding border search authority, customs officers may search,

without any individualized suspicion, the contents of a traveler's briefcase and luggage, United

States v. Tsai, 282 F.3d 690, 696 (9th Cir. 2002), his "purse, wallet, or pockets," Henderson, 390

F.2d at 808, and the papers stored in such closed containers. See United States v. Schoor, 597

F.2d 1303, 1305-06 (9th Cir. 1979) (airway bills carried by passengers); United States v.

Grayson, 597 F.2d 1225, 1227 (9th Cir. 1979) (papers in shirt pocket); United States v. Fortna,

796 F.2d 724, 738 (5th Cir. 1986) (documents in carry-on bag, including map and handwritten

note). They may also view pictures, films, and similar graphic materials. See Thirty-Seven

Photographs, 402 U.S. at 365; 12 200-Ft. Reels of Super 8MM. Film, 413 U.S. at 124 ("movie

films, color slides, photographs, and other printed and graphic material"); United States v.

Borello, 766 F.2d 46, 58-59 (2d Cir. 1985) ("the opening of the cartons and the screening of the

8-millimeter films were plainly permissible steps in a reasonable border search").

Most recently, in Flores-Montano, the Supreme Court reaffirmed the broad power of

customs officials to search property without particularized suspicion, holding "that the

Government's authority to conduct suspicionless inspections at the border includes the authority

to remove, disassemble, and reassemble a vehicle's fuel tank." 541 U.S. at 155. While Flores-

1  Montano involved the fuel container in a car, nothing in the opinion suggests, that the Court

2  would apply a different analysis to border searches of other physical objects and containers.

3  Indeed, the Court's opinion itself broadly referenced border searches of "property," Flores-

4  Montano, 541 U.S. at 155-56, a fact that has not escaped the Ninth Circuit's attention. See

5  United States v. Camacho, 368 F.3d 1182, 1183 (9th Cir. 2004) ("The Supreme Court [in Flores-

6  Montano] recently made clear that reasonable suspicion is usually not required for officers to

7  conduct non-destructive border searches of property.") (emphasis added).

8      The defendant takes great efforts to convince this Court that their was no "reasonable

9  suspicion" to search the defendant's computer. Without conceding that there was not

10  "reasonable suspicion,"[4] the existence of and amount of suspicion raised by the defendant's

11  actions at SFO is irrelevant. The defendant's computer was, like any other property, subject to

12  search with or without any quantum of suspicion. In light of this well-established legal

13  principle, the defendant's argument fails.

14

15      4.    The Defendant Relies on a Discarded Distinction Between "Routine" and "Non-
              Routine" Border Searches of Property.

16

17      The defendant mistakenly draws from the Arnold case and articulates two different types

18  of searches - - routine and non-routine - - and asks this Court to employ that faulty standard in

19  finding that a computer search is a non-routine search that would require a level of reasonable

20  suspicion before a computer may be searched at the border.  However, the Arnold case relies

21  heavily on United States v. Molina-Tarazon, 279 F.3d 709 (9th Cir. 2002), which has since been

22  disavowed by the Supreme Court on exactly this point. In Molina-Tarazon, a divided panel held

23  ──────────────

24      [4] In fact, the *Declaration of Sheryl Edwards*, the CBP Officer who first encountered the
    defendant, demonstrates that ample suspicion existed that the defendant may have engaged in

25  wrongdoing. The defendant was visibly upset about having been referred for secondary
    inspection. He was carrying an amount of luggage that was inconsistent with the stated length of

26  his trip. He was returning from a country known to be a location for child sex tourism and
    source of child pornography. He was carrying at least one CD-R that appeared to had a

27  suspicious Microsoft logo and potentially pirated software. And, when Officer Edwards
    attempted to view the defendant's CD-Rs, the defendant became upset and attempted to stop her

28  from viewing the CD-Rs. *Edwards Decl.*, ¶¶ 4, 7-8.

that the "border search exception" authorized only "routine searches," that "[i]n order to conduct a search that goes beyond the routine, an inspector must have reasonable suspicion," and that the "critical factor" in determining whether a search of "inanimate objects" is "routine" is the "degree of intrusiveness." 279 F.3d at 712-13 (emphasis in original). The Supreme Court unanimously repudiated Molina-Tarazon's analysis, holding that term "routine" used in prior Supreme Court border search cases was merely descriptive and not intended to be the source of a constitutional test for whether a heightened level of suspicion should be required in any given case. Flores-Montano, 541 U.S. at 152. The Court further made clear that it was a mistake to use a "balancing test" comparing the degree of intrusiveness posed by a vehicle search with that caused by physical body searches. Id. As the Court concluded, "[c]omplex balancing tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border searches of vehicles." Id.

In the wake of Flores-Montano, the Ninth Circuit recognized that any legal distinction between routine and non-routine border searches "was specifically limited to searches of the person." United States v. Chaudhry, 424 F.3d 1051, 1054 (9th Cir. 2005) (emphasis added); accord United States v. Flores-Montano, 424 F.3d 1044, 1049 n.6 (9th Cir. 2005) (per curiam) (recognizing that distinction between "routine" and "non-routine" border searches has been "severely undermined if not completely overruled in the context of property searches"). It also acknowledged that Flores-Montano foreclosed the use of a balancing test to determine if a property search at the border becomes so intrusive, akin to an invasive physical body search, that it ceases to be "routine," thereby requiring reasonable suspicion. See United States v. Cortez-Rocha, 394 F.3d 1115, 1119 (9th Cir. 2005) ("the application of the routine/non-routine balancing test . . . was specifically refuted in Flores-Montano"); Flores-Montano, 424 F.3d at 1049 n.6 ("routine/non-routine analysis . . . has been so soundly rejected in the Constitutional context").

**B.    Computer Storage Devices Are Neither Conceptually Nor Constitutionally Different than Other Closed Storage Containers Subject to Suspicionless Border Searches.**

1  In drawing a distinction between materials in luggage versus materials in a computer, the

2  defendant, disregards contrary decisions upholding suspicionless border searches of computers;

3  assumes without foundation that electronic materials are deserving of greater Fourth Amendment

4  protection than physical items; and erects a false dichotomy between computers and other closed

5  storage containers, thereby running afoul of Supreme Court precedent foreclosing any Fourth

6  Amendment distinction based on the type of container searched or the nature of its contents.

7

8          1.    Courts Have Recognized That No Suspicion Is Required to Search Computer
                 Media at the Border.
9

10  Courts have already upheld suspicionless border searches of computer storage devices.

11  In United States v. Ickes, 393 F.3d 501 (4th Cir. 2005), the Fourth Circuit upheld the border

12  search of a computer and compact discs found in the defendant's van during a customs search at

13  the United States-Canada border.  The court held that the border search of those electronic

14  media, which contained evidence of child pornography, was both within Customs' broad

15  statutory authority to search and did not run afoul of the Fourth Amendment.  Id. at 505-06.  In

16  so holding, the court rejected the defendant's invitation to engraft a reasonable suspicion

17  requirement for computer searches at the border.  Id. at 507.  As the court explained, "[t]he

18  essence of the border search doctrine is a reliance upon the trained observations and judgments

19  of customs officials, rather than upon constitutional requirements applied to the inapposite

20  context of this sort of search."  Id.  Citing Flores-Montano and Montoya de Hernandez, the court

21  stressed the government's "overriding interest in securing the safety of its citizens" and

22  contrasted that with the substantially diminished privacy interests of travelers seeking entry into

23  the country.  Id. at 506.  Similarly, in United States v. Roberts, 86 F. Supp. 2d 678 (S.D. Tex.

24  2000), the court, in discussing the constitutionality of the border search of a defendant's

25  computer and diskettes, "analogized the Fourth Amendment protection appropriately afforded an

26  individual's computer files and computer hard drive to the protection given an individual's

27  closed containers and closed personal effects."  Id. at 688-89.  With this analogy in mind, the

28  court upheld the border search of the defendant's computer and diskettes as a "paradigmatic

1  routine border search" that was no different than the "opening of luggage, itself a closed

2  container." Id. at 689.[5] Finally, in United States v. Irving, 2003 WL 22127913 (S.D.N.Y. 2003),

3  the court likewise analogized a border search of the contents of a disposable camera and 3.5 inch

4  computer diskettes to the "routine border search" of other "closed containers." Id. at *5. It held

5  that "agents were entitled to inspect the contents of the diskettes even absent reasonable

6  suspicion . . . ." Id.[6]

7        While the Ninth Circuit has not yet squarely held, like the courts in Ickes, Roberts, and

8  Irving, that computer searches at the border do not require reasonable suspicion, it has recently

9  answered affirmatively the question "whether, absent a search warrant or probable cause, the

10  contents of a laptop computer may be searched at an international border." United States v.

11  Romm, 455 F.3d 990, 993 (9th Cir. 2006). In Romm, the defendant was denied entry to Canada

12  when Canadian immigration officials discovered evidence of child pornography websites on his

13  laptop computer. Upon his re-entry to the United States, ICE agents conducted a forensic search

14  of the computer, which revealed images of child pornography. The defendant unsuccessfully

15  challenged whether the computer search fell "under the border search exception." He alleged that

16  because he was denied entry to Canada, he was subject to an "official restraint" exception to the

17  border search doctrine. Id. at 996-97. The Court rejected this arguments and in doing so,

18  explained, "searches made at the border . . . are reasonable simply by virtue of the fact that they

19  occur at the border." Id. (quoting Flores-Montano, 541 U.S. at 152-53) (internal quotation marks

20  omitted). It thus concluded that "the routine border search of Romm's laptop was reasonable,

21  regardless whether Romm obtained foreign contraband in Canada or was under 'official

22  restraint.'" Id. Thus, while Romm is not dispositive, it nonetheless reiterates that Flores-

23  ────────────────────

24        [5]  The district court also held, alternatively, that the border search was supported by

25  reasonable suspicion. Id. at 688 n.4. The Fifth Circuit affirmed the district court's decision on
this alternative ground without reaching the legal question of whether computers may be

26  searched at the border without any level of suspicion. See United States v. Roberts, 274 F.3d
1007, 1012 (5th Cir. 2001).

27        [6]  Like the district court in Roberts, the court in Irving also upheld the border search on

28  the alternative ground of reasonable suspicion without deciding whether the searches "were
routine or non-routine." United States v. Irving, 452 F.3d 110, 124 (2006).

1  Montano was not limited to vehicle searches and thereby reinforces the conclusion that

2  computers, like other closed containers, may be searched at the border without reasonable

3  suspicion.

4      To support his claim that a search of a computer should be entitled to a heightened level

5  of scrutiny, the defendant cites to a number of cases in which courts addresses bodily intrusions

6  at the border which require a degree of suspicion prior to search.  What should go without saying

7  is that a person's computer is simply not the same as one's bodily integrity.  As the Supreme

8  Court explained in Wyoming v. Houghton, 526 U.S. 295 (1999), which dealt with the search of a

9  passenger's purse in a car, there is a clear distinction between "searches of the person and

10  searches of property." Id. at 303 n.1.  While there may be "unique, significantly heightened

11  protection afforded against searches of one's person," the search of property like a passenger's

12  purse is constitutionally distinct because the "traumatic consequences" attendant to any search of

13  the physical body "are not to be expected when the police examine an item of personal property"

14  like a purse.  Id. at 303.  The same conclusion should apply to searches of computers.  Cf.

15  Okafor, 285 F.3d at 845 (treating involuntary x-ray of a person at border differently than x-rays

16  of objects at border).  It was a mistake to equate a computer search with a highly invasive body

17  search and import the protections afforded to persons subject to invasive body searches to a

18  much more limited computer search.  Whatever limitations the Fourth Amendment may impose

19  on intrusive physical body searches at the border,[7] those limitations have not been extended to

20  personal property -- whether it be luggage, a gas tank, or electronic computer files.

21

22      2.    Computer Storage Devices Are Conceptually Identical to Closed Storage
23            Containers.

24

25      [7]    The Supreme Court has "suggest[ed] no view on what level of suspicion, if any, is
    required for nonroutine border searches such as strip, body cavity, or involuntary x-ray
26  searches." Montoya de Hernandez, 473 U.S. at 541 n.4.  The Ninth Circuit, however, has held
    that strip and body cavity searches, "unlike luggage searches and patdowns, must be supported
27  by reasonable suspicion." United States v. Gonzalez-Rincon, 36 F.3d 859, 864 (9th Cir. 1994).
    Similarly, involuntary x-ray searches of the body must be supported by reasonable suspicion
28  under the Ninth Circuit's precedents. See United States v. Ek, 676 F.2d 379, 382 (9th Cir.
    1982); Camacho, 368 F.3d at 1186 n.1.

1

2    For Fourth Amendment purposes, "[c]ourts have uniformly agreed that computers should

3    be treated as if they were closed containers."  United States v. Al-Marri, 230 F. Supp. 2d 535,

4    541 (S.D.N.Y. 2002); accord United States v. Upham, 168 F.3d 532, 536 (1st Cir. 1999); Davis

5    v. Gracey, 111 F.3d 1472, 1480 (10th Cir. 1997); Trulock, 275 F.3d at 403; United States v.

6    Chan, 840 F. Supp. 531, 534 (N.D. Cal. 1993); United States v. Barth, 26 F. Supp. 2d 929, 936

7    (W.D. Tex. 1998); United States v. David, 756 F. Supp. 1385, 1390 (D. Nev. 1991); see also

8    United States v. Runyon, 275 F.3d 449, 458 (5th Cir. 2001) (both parties conceded that computer

9    disks are "containers" for Fourth Amendment purposes); but cf. United States v. Carey, 172 F.3d

10   1268, 1275 (10th Cir. 1999) (criticizing file cabinet analogy where police with search warrant for

11   only drug evidence expanded scope of computer search to child pornography evidence).  As the

12   Ninth Circuit has explained, "[c]omputers are simultaneously file cabinets (with millions of

13   files) and locked desk drawers; they can be repositories of innocent and deeply personal

14   information, but also of evidence of crimes."  United States v. Adjani, 452 F.3d 1140, 1152 (9th

15   Cir. 2006).

16       It follows, therefore, that because the contents of suitcases, purses, and briefcases can be

17   searched at the border without particularized suspicion, there is no reason to accord special

18   treatment to computers simply because they store information electronically.  It should not

19   matter, for instance, whether documents and pictures are kept in "hard copy" form in an

20   executive's briefcase or stored digitally in a computer.  The authority of customs officials to

21   search the former should extend equally to searches of the latter.  Indeed, this highlights one of

22   the critical flaws in the defendant's court's reasoning.  Had defendant carried with him in a

23   briefcase hard copies of the same pictures of child pornography that were contained on his

24   computer devices, there would be no doubt that a customs official could, without any suspicion,

25   search the contents of the briefcase and then seize any child pornography found during the

26   search.

27       The Arnold court's assumption that people value their electronic privacy over the privacy

28   rights they have in their physical possessions was unfounded.  Non-expressive materials carried

by passengers -- contraception devices, intimate attire, prescription medications, and so forth -- can reveal undisclosed details about sexual practices, personal hygiene, and physical health that are just as private as what electronic data on a personal computer might reveal. Yet these physical items are routinely exposed during suspicionless border searches of luggage because the privacy interests that inhere in such items must, at the border, yield to the government's countervailing interest in border security. There is thus no valid reason to afford greater Fourth Amendment protection to computer storage devices at the border, since the invasion of privacy attendant to computer searches is no more intrusive than that caused by searches of bags and other closed containers.

    3.    The Arnold Court's View of Computer Searches as Invasions of the Mind Lacks Merit.

    The Arnold court's analysis was further flawed because it rested on a faulty analogy between computers and the human mind. The computer is a tool for transferring our thoughts and ideas to written word or graphical image; it is not the thought or idea itself. Additionally, the view of computers as interchangeable with our minds overlooks the fact that computers need not be carried across the border at all. The traveler alone decides what content to store on a computer and, more to the point, whether to bring the computer across the border. In the same way that a traveler "may avoid exposing personal belongings . . . by simply leaving them at home," O'Connor v. Ortega, 480 U.S. 709, 725 (1987), a traveler seeking entry into the United States can avoid a search of his computer's contents by simply leaving the computer at home.

    C.    **Suspicionless Computer Searches Are Essential to Vindicate the Government's Paramount Interest in Border Security**.

    "Careful review of transit through our international borders is essential to national security, health, and public welfare." Okafor, 285 F.3d at 845. If anything, the proliferation of computers militates heavily in favor of, not against, suspicionless computer searches. Customs officials are generally charged with enforcing statutes that restrict importation of unlawful materials without regard to the form, paper or electronic, that such materials may take. See, e.g.

19 U.S.C. § 1305 (prohibiting importation of treasonous, seditious, and obscene materials).  And they are specifically empowered to enforce intellectual property laws, see, e.g., 19 C.F.R. §§ 133.22 (trademarks), 133.42 (copyrights), in the course of which they must fairly be expected to encounter documentary and digital materials stored on computers, compact discs, digital video discs, and myriad other electronic storage devices.

A "[a] reasonable suspicion requirement in this context would remove the significant deterrent effect of suspicionless searches," Cortez-Rocha, 394 F.3d at 1120, and could actually encourage criminals to use computers as their smuggling container of choice.  See id. (reasonable suspicion requirement for cutting open spare tire would "encourage the use of spare tires and other locked containers as a means of smuggling"); United States v. Martinez-Fuente, 428 U.S. 543, 557 (1976) (reasonable suspicion requirement for fixed border checkpoints "would largely eliminate any deterrent to the conduct of well-disguised smuggling operations"); Ickes, 393 F.3d at 506 (creating exception for expressive materials on computers would create "a sanctuary at the border . . . even for terrorist plans" and "undermine the compelling reasons that lie at the very heart of the border search doctrine").  Just as physical contraband rarely will be strewn across the floor of a car or visibly exposed inside a suitcase "since by their very nature such goods must be withheld from public view," Ross, 456 U.S. at 820, graphic contraband like child pornography or pirated software is unlikely to be transported openly in "hard copy" format because would-be smugglers know that cars and luggage may be searched randomly without individualized suspicion.

Furthermore, defendant's request for preferential treatment of computer devices will lead to incongruous results.  An album of printed photographs could be randomly inspected at an international airport, e.g., Thirty-Seven Photographs, 402 U.S. at 365, but those same images saved on a digital camera's memory stick could not.  Compact discs or digital video discs shipped from overseas could be examined at a port of entry without any suspicion, e.g., 12 200-Ft. Reels of Super 8MM. Film, 413 U.S. at 124, but music and movies digitally downloaded on a computer hard drive would be off limits.

1

2

II.    ATTORNEY FILES - HARD COPY OR ELECTRONIC - HAVE NEVER BEEN AND
SHOULD NOT BE INSULATED FROM SEARCHES BY THE GOVERNMENT.

3        Defendant asks this Court to disregard centuries of law and accept, without any legal

4    support, his claim that attorneys, by virtue of their role as repositories of confidential

5    communications, have a higher expectation of privacy and should not be subject to the same

6    search conditions as every other citizen.  Before this Court even considers the defendant's

7    argument, it should require the defendant to identify the purportedly privileged materials that

8    impart the heightened level of privacy and protections that he claims.  The defendant's argument

9    is premised on the fact that the computer contained privileged matters yet he has not identified a

10    single privileged document.  Defendant admits that his motion is not premised on a violation of

11    the attorney-client privilege.  *Defendant's Memorandum*, p. 15.  However, his motion is

12    premised on the existence of privileged materials on the searched media and he should be

13    required to substantiate that claim.  By footnote, the defendant claims that he does not know if

14    the government has violated the attorney-client and work product privileges because he was not

15    present during the search of his belongings.  *Defendant's Memorandum*, p. 15, n. 12.  In fact, the

16    defendant has had full access to the searched materials in the course of discovery and is more

17    than able to identify any privileged materials.  This Court should not permit the defendant to

18    assert the attorney-client privileged as a basis for his right to a heightened degree of privacy

19    without requiring the defendant to identify which documents are purportedly privileged.[8]

20        If the Court is inclined to consider the defendant's argument without this showing, the

21    defendant's argument fails for several reasons.[9]  Attorneys, like doctors, therapists, priests, and

22

23        [8]  The electronic media in question has remained in the custody of the United States
pursuant to Title 18, United States Code, section 3509(m) ("In any criminal proceeding, any
24    property or material that constitutes child pornography . . . shall remain in the care, custody, and
control of either the Government or the Court.").  However, the defendant has had full access to
25    review the media and its contents.  To comply with the mandates of Title 18, United States Code,
section 3509(m), the United States suggests that it make the media available to the Court for it to
26    review with the list of allegedly privileged materials to be provided by the defendant.

27

28        [9]  In support of his position, the defendant relies on United States v. Arnold, see
*Defendant's Memorandum* at p. 12.  The Arnold case does not address the search of an attorney
computer and defendant's citation to this case is misplaced.

other persons who gain private, sensitive, and confidential information in the course of their

profession, have been and are subject to reasonable searches - whether at a border, an office or a

home.  To the extent the search of the defendant's property was in violation of the Fourth

Amendment, the remedy is not suppression but rather a consideration of what files, if any are

privileged, and potential suppression of those files.  Finally, the defendant's dire pronouncement

that border searches of attorney computers will impact the ability and confidence of clients to

convey information to attorneys based is a nonsensical, unsupported prediction.

>    **A.     Attorneys Files Are Subject to Reasonable Searches Like Any Other
>            Property**.

The Fourth Amendment does not grant the defendant an exemption from a reasonable

search by virtue of his status as an attorney and a potential repository of privileged

communications.  The Fourth Amendment provides for

> the right of people to be secure in their persons, house, papers, and
> effects, against <u>unreasonable</u> searches and seizures, shall not be
> violated . . . .

U.S. Constitution, Article IV (emphasis added).   Attorney files have always been subject to and

are not immune from search.  <u>United States v. Mittleman</u>, 999 F.2d 440, 445 (9th Cir. 1993)

("Law offices are not immune from search."); <u>see e.g</u>, <u>Andresen v. Maryland</u>, 427 U.S. 463, 465

(1976) (search of attorney law office pursuant to search warrant); <u>In re Grand Jury Subpoenas</u>

<u>Dated December 10, 1987</u>, 926 F.2d 847, 851-52 (9th Cir. 1991) (searching two offices of law

firm pursuant to search warrants); <u>United States v. Friedman</u>, 210 F.3d 227 (4th Cir. 2000)

(search of attorney briefcase pursuant to search warrant); <u>United States v. Humphreys</u>, 982 F.2d

254, 259  (8th Cir. 1993)(search of attorney's office pursuant to search warrant).  Rather than

carve out a new rule for searching an attorney's files, the courts have simply provided that the

search must be conducted reasonably, consistent with the dictates of the Fourth Amendment.

<u>Mittleman</u>, 999 F.2d at 445 (acknowledging that although a search of known attorney files

should be undertaken carefully, special legal rules are not necessary for such searches).

In the course of a reasonable search, even if an attorney asserts that the files being

1    searched are privileged, that assertion alone will not limit the ability of the agents to continue

2    with the search.  In United States v. Friedman, agents obtained a search warrant to search the

3    contents of briefcases known to belong to an attorneys.  The defendant moved to suppress

4    claiming that the search warrant pursuant to which the briefcases were searched failed to include

5    reference to the known fact that the defendant was an attorney and the fact that defendant had

6    asserted the attorney-client privilege with respect to the documents in his briefcase.  210 F.3d

7    227, 229 (3d Cir. 2000).  The Circuit could held that the fact that the attorney was an attorney or

8    that his briefcase contained privileged files did not impact the ability of the agents to search the

9    briefcase.

10       The fact remains that the question whether a document is privileged
         has nothing at all to do with the separate question whether there
11       existed probable cause to justify the issuance of a warrant to seize that
         document.  In other words, the probable cause determination would
12       not have changed in the slightest had the warrant affidavit at issue
         made clear that [the defendant] had asserted the attorney/client
13       privilege with respect to some of the documents seized.

14   Id. at 229-30.

15       Defendant claims that he told Officer Edwards that he was an attorney and advised her of

16   the nature of the materials in his possession.  The Declarations of Officer Edwards and Cross

17   directly refuted the defendant's claims show that the defendant's declaration should be regarded

18   with great suspicion.  But, even if the defendant did tell the agents that he was an attorney and

19   did tell the agents that the media contained attorney-client privileged materials, the analysis is

20   still the same.  His status as an attorney and the existence of privileged files is irrelevant.

21   Although the existing case law addresses attorney searches resulting from search warrants, the

22   concept is identical.  In non-border cases, when law enforcement sought to search attorney files,

23   the search was a "reasonable" one in which a search warrant was obtained pursuant to normal

24   search warrant procedure.  The fact that attorney files were being searched did not require a

25   separate and distinct procedure.[10]

26

27       [10]   The defendant cites a Department of Justice policy in which the Department cautions
         agents to exercise "special care" when planning a computer search that may result in the seizure
28       of legally privileged documents. Defendant's Memorandum, p. 22.  Department of Justice
         admonishments to proceed with caution cannot realistically be regarded as any sort of

**B.    A Border Search of Attorney Files is Not An Unreasonable Search In Violation of the Fourth Amendment**.

The defendant alleges that the sanctity of the attorney-client privilege affords an attorney a heightened expectation of privacy.  In essence, the defendant is asking this court disregard the long-recognized and paramount national interest in protecting the borders of the United States and place that compelling interest below the interests of attorneys in maintaining client confidences.

1.    Attorneys, Like Other Travelers, Have a Lesser Expectation of Privacy at the Border.

Courts have consistently recognized that travelers do not have the same expectations of privacy in their possessions and persons at the borders, as they would at other locales.  See infra I.A.2.  Attorneys do not, and should not, as the defendant contends have a heightened expectation of privacy at the border.  Candidly, the defendant admits that there is not a single federal case that addresses the border search of attorney computer.  However, the one case cited by defendant, United States v. Modes, details a border search of privileged attorney files; recognizes the border search exception to the Fourth Amendment; and condones the search of the attorney files at the border.  See  United States v. Modes, 787 F. Supp. 1466, 1475 (Ct. Int'l Trade 1992).  Contrary to the defendant's contention, the Modes court did not condemn the search of the purportedly privileged files; the court held that the seizure and detention of the files was improper.  Id.  In Modes, customs agents served subpoenas on the defendant and his attorney seeking production of records in early May 1985.  Defense counsel informed the investigating customs case agent that they needed additional time to respond to the subpoenas and that he and an investigator would be traveling to Taiwan to conduct an internal investigation and gather information pertinent to the customs investigation.  In late May 1985, on his return from Taiwan, while waiting to clear customs, the investigator's briefcase was searched.  The investigator told the customs agents that he worked for an attorney and that the files in his

---

recognition that attorneys are subject to a higher expectation of privacy or otherwise subject to a separate standard of review prior to issuance of a search warrant.

1   briefcase were attorney-client and work product protected files pertinent to a customs

2   investigation.  Id. at 1468-69.  After the search, which revealed no contraband, a customs

3   supervisor detained the files and forwarded them to the investigating case agent.

4       The Modes court acknowledged that the privileged materials were properly searched

5   pursuant to the authority vested in customs officials.  Id. at 1474.   The court held that the initial

6   inspection was "founded on mere suspicion" of a reasonable nature based on the passenger's

7   travel from a source country, his declaration of money exceeding the allowed amount, and that

8   he was a consultant.  Id. at 1475.  Although the United States believes that the Modes court

9   improperly implied that a level of "mere suspicion" was necessary for a border search, the fact

10  remains that the court found that the search was proper and did not require, as the defendant

11  suggestion, a heightened level of reasonable suspicion to conduct the search of the attorney files.

12  The court condemned the seizure and detention of the files because after the search, the agents

13  did not find any incriminatory materials that would justify detention of the files.  Id. at 1475.

14      Attorneys and attorney files existed at the time the Fourth Amendment and the customs

15  statutes authorizing suspicionless and warrantless border were drafted.  Tellingly, the Framers

16  did not chose to except attorney files from search, impart a higher degree of suspicion before

17  attorney files can be drafted, or acknowledged a heightened level of privacy of attorneys.

18

19      2.   The Container In Which the Defendant's Files Were Housed Does Not Impact the
20           Analysis.

21      Defendant alleges that attorneys have a heightened expectation to privacy due to the fact

22  that data is stored on a computer, rather than a written file.  *Defendant's Memorandum*, p. 17.

23  Not only is the defendant's argument devoid of any support, it is in directly contrary to the

24  wealth of well-established law holding that for Fourth Amendment purposes, a computer should

25  be treated as if they were closed containers.  See infra I.B.2.  In an effort to gain a foothold for

26  his tenuous position, the defendant advises that the California State Bar has recognized that

27  privileged materials can be contained in electronic format.  The fact privileged material can be

28  contained in electronic format does not render electronic documents deserving of any higher

1  level of protection than a legal pad with an attorney's trial strategy.

3         3.   <u>The Search of the Defendant's Electronic Data Was Reasonable</u>.

4         Insofar as the Fourth Amendment precludes unreasonable searches, any search is

5  properly reviewed for reasonableness.  The CBP agents did not engage in a widespread,

6  unfettered search to seek out and discern the contents of any privileged materials that the

7  defendant may have been carrying.  Each of the officers  has described the manner in which they

8  searched the electronic media.  Officer Cross stated that he reviews for images files.  *Cross*

9  *Decl.*, ¶ 5.  Officer Edwards stated that she opens the files in a thumbnail view and searches

10  specifically for contraband.  *Edwards Decl.*, ¶ 11.  Each officer proceeded in a reasonable and

11  purposeful manner to determine whether the defendant was carrying contraband into the United

12  States.  The defendant contends that because a search of a computer can discover deleted files, it

13  is therefore unreasonable.  *Defendant's Memorandum*, p. 18.  What defendant disregards is the

14  reality that computers have been searched in this manner for years and to date, no court has ruled

15  that the fact that deleted files can be recovered renders a search unreasonable.  For all of these

16  reasons, the United States contends that the search of the defendant's computer was conducted in

17  a reasonably and appropriate manner and that the information obtained therefrom should not be

18  suppressed.

20  **C.    Suppression Is Not the Remedy For An Impermissible Search of Attorney-Client**
        **Privileged Files**.

22      Rather than work within the established practice that ensures that privileged materials, if

23  obtained by the government, are not impermissibly used, defendant asks this Court to create a

24  new standard that attorney files - privileged or not - are entitled to a heightened expectation of

25  privacy in attorney files and condemn the search as a whole.  If a search of attorney files does

26  unreasonably intrude upon privileged materials, the remedy is exclusion of the privileged

27  documents, not suppression.  <u>Mittleman</u>, 999 F.2d at 445 (requiring suppression of only those

28  materials that were outside the scope of the lawfully obtained warrant).  If the CBP Officers

searched and seized privileged materials, the defendant is required to identify these documents and request an *in camera* review.  See  In re Grand Jury Subpoenas Dated December 10, 1987, 926 F.2d 847, 858-59 (9th Cir. 1991)(upon defendant's assertion of privilege as to the documents obtained pursuant to search warrant, the court reviewed the documents in camera and determined that no privilege applied); see also United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1993) (to avail himself of a remedy, the defendant must identify which documents were privilege for the district court to review and make a determination).  The defendant bears the burden to identify the documents and substantiate the basis for the privilege.  "The party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication."  Ralls v. United States, 52 F.3d 223, (9th Cir. 1995); United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1993) (upon raising the issue of privilege, the defendant is required to show which documents are privileged).  In Humphreys, the defendant claimed that privileged files were seized during execution of a search warrant at his law office and that these materials were being used against him.  In ruling against the defendant, the court stated that the defendant "provided nothing more than speculation and contradictory statements.  No file or documents were produced for review of the district court . . . .  Even if the search was overbroad in scope, no showing of its effect upon the prosecution has been made."  Humphreys, 982 F.2d at 259.

Like in Humphreys, the defendant has not, identified a single document that was on his laptop and that was subject to the attorney-client privilege.  This Court should not permit the defendant to assert the attorney-client privileged as a basis for his right to a heightened degree of privacy without requiring the defendant to identify which documents are purportedly privileged.

**D.    The Potential To Search An Attorney's Files Does Not Impact the Attorney-Client Relationship**.

Permitting searches of an attorney's computer is not the "Brave New World" scenario that the defendant portends.  Attorney files have been subject to search for centuries and yet clients have continued to speak freely with their attorneys and seek out legal advice.  First, as the

1    concept of the border search contemplates, the customs authorities are seeking to prevent the

2    introduction of contraband, not attorney-client privileged communications, into the United

3    States. The searches are undertaken carefully to determine if contraband is present and if not,

4    the travelers belongings are released. Further, with respect to border searches, by defendant's

5    own admission, "the number of travelers to whom this protection will apply is a tiny fraction of

6    international passengers." See *Defendant's Memorandum*, p. 21. Accordingly, the number of

7    attorneys who travel internationally with client confidences would be quite limited and the

8    clients whose fear of compelled disclosure by their attorneys in the course of international travel

9    would be a small population. The limited number of persons potentially affected under

10   defendant's analysis does not warrant this Court uprooting centuries of law condoning and

11   approving the practice of border searches.

12

13   III.    THE DEFENDANT IS NOT ENTITLED TO AN EVIDENTIARY HEARING.

14

15        "An evidentiary hearing on a motion to suppress need be held only when the moving

16   papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to

17   conclude that contested issues of fact exist." United States v. Howell, 231 F.3d 615, 620 (9th Cir.

18   2000). An evidentiary hearing is not permitted, as the defendant requests, to "present and

19   develop further evidence in support of" his Motion. *Defendant's Notice of Motion*. As set forth

20   above, the defendant has failed to allege with any particularity that privileged documents even

21   existed on the laptop computer. The broad assertions by the defendant and his business partner,

22   Mr. Stern, of the existence of these documents without identifying a single one do not rise to the

23   level of "definiteness, clarity, and specificity" necessary for this Court to entertain holding an

24   evidentiary hearing. Moreover, the issues raised by the defendant are entirely legal, not factual,

25   and do not require testimony for this Court to rule on the Motion. Finally, even if this Court

26   assumes all the facts in the defendant's Declarations to be true, the outcome is the same. For all

27   of these reasons, the defendant is not entitled to an evidentiary hearing on his Motion to

28   Suppress.

1

**CONCLUSION**

2      The defendant has failed to make the threshold showing for this Court to grant an

3   evidentiary hearing insofar as no material issues of contested fact exist.  Further, for the reasons

4   set forth above and those to be stated at a hearing on this Motion, the defendant's Motion to

5   Suppress should be denied.

6

7

8
Date:    March 7, 2008.

9

Respectfully Submitted,

JOSEPH P. RUSSONIELLO
United States Attorney

10

11

12
            /s/
DENISE MARIE BARTON
Assistant United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                          **CERTIFICATE OF SERVICE**

3

4        The undersigned hereby certifies that she is an employee of the office of the United

5   States Attorney, Northern District of California and is a person of such age and discretion to be

6   competent to serve papers.  The undersigned certifies that, on March 7, 2008, she served a copy

    of the foregoing document described as:

7

8        **MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE AND**
                  **REQUEST FOR AN EVIDENTIARY HEARING**

9

10      X      Via email (due to the ECF system maintenance on March 7, 2008) on the parties as set

11  forth below:

12

13  **Craig H. Bessenger**                    **Edwin Ken Prather**
    **Clarence & Dyer LLP**                    **Clarence & Dyer LLP**
14  **899 Ellis Street**                       **899 Ellis Street**
    **San Francisco, CA 94109**                **San Francisco, CA 94109**
15  **415.749.1800**                           **(415) 749-1800**
    **415.749.1694 (fax)**                     **(415) 749-1694 (fax)**
16  **cbessenger@clarencedyer.com**            **eprather@clarencedyer.com**

17  **Nanci L. Clarence**
    **Clarence & Dyer LLP**
18  **899 Ellis Street**
    **San Francisco, CA 94109**
19  **415-749-1800**
    **415-749-1694 (fax)**
20  **nclarence@clarencedyer.com**

21

22

23      I declare under penalty of perjury that the foregoing is true and correct.

24

25  Dated:    March 7, 2008

26                                          /s/
                                          DENISE BARTON
27                                         United States Attorney's Office

28

MEMORANDUM IN OPPOSITION TO MOTION TO SUPPRESS EVIDENCE - CR 07-0594 PJH        25